## CASES ARGUED AND DETERMINED

IN THE

# SUPREME COURT OF SOUTH CAROLINA.

Justices of the Supreme Court during the Period comprised in this Volume.

HON. W. D. SIMPSON, CHIEF JUSTICE.
HON. HENRY McIVER, ASSOCIATE JUSTICE.
HON. SAMUEL McGOWAN, " "

---

## TOMPKINS v. TOMPKINS.

1. Cotton belonging to an estate was put into the hands of factors by one executor, and afterwards shipped and sold by direction of the other executor, and the proceeds were drawn partly by one and partly by the other. *Held*, that each was chargeable only with the amount by him received.

2. A testator advanced $5,500 to make the one-third cash payment on a tract of land purchased by his sons. In his will, supposing himself to own a one-third interest in this land, he declared in the ninth clause that "upon the payment of $5,500 to my estate, or the accounting therefor in the division of the residuum by my sons, F. and R., I will, devise and bequeath unto them and their heirs forever, all my interest, being the one-third part of a tract of land," &c. In the eleventh clause, the testator canceled all debts due by his sons, except "* * and also a

A

·debt of $5,500 against my sons, F. and R., mentioned in the ninth clause of my will." *Held*, that the original debt was canceled by the will, and the debt excepted in the eleventh clause did not arise, F. and R. having declined to take the land.

3. Objection to testimony as incompetent, under section 415 of the code, comes too late where first raised in exceptions to the referee's report.

4. A partnership between testator and his son having been dissolved by the death of the former, his estate is chargeable with its proportion of all losses properly traceable to the effort to fulfill contracts binding at the time of dissolution and to expenses incurred in the legitimate effort to wind up the partnership matters, but not for losses resulting from new business.

5. A merchant's account, contracted during the war, not being shown to have been made with reference to Confederate money as a basis of value, should not be scaled.

6. Interest might properly be allowed by a court of equity on an open account due by testator to his executor, where interest is charged on the executor's accounts with the estate and upon the accounts between the several parties.

7. Finding of fact by referee and Circuit judge affirmed.

8. In the absence of evidence showing that Confederate money and bonds could have been made available for purposes of the estate, executors are not chargeable with such assets which were left by testator and came into their hands only a few months before the termination of the war.

9. And the debts by specialty being large, and the assets apparently insufficient for their payment, a simple contract claim of one executor was not extinguished by Confederate money in testator's hands at his death in May, 1864, and received by the other executor in September following.

10. A. and B. were equally liable as sureties for the payment of a note, and A. paid it, using in part (less than half), money of B. A. died, and, by his will, bequeathed this note to C. upon conditions which C. refused to perform. *Held*, that B. had no right to recover from A.'s estate the amount of B.'s money so used by A.

11. In the absence of evidence showing that notes, &c., of an estate administered just after the war, could, by proper diligence, have been collected, the executors are not liable for such of these notes as were produced at the trial uncollected, the executors testifying that they had tried to collect them and failed.

12. Executors are entitled to credit for the payment of an informal judgment rendered against themselves as executors, the debt itself being undisputed.

13. In stating an executor's accounts, the payments made in each current year should be deducted before striking a balance to bear interest for the year in which said payments were made.

14. A legatee receiving cotton which he sold for gold in 1865, as a part of his interest in the estate, is properly chargeable with the value of the gold in currency at that time, all the other transactions of the estate having been had in currency.

15. Executors held liable for interest after a decree requiring them to account, they not having shown that the funds were kept on hand unemployed to meet the results of the accounting.

16. When an executor is required to account before the Court of Equity, it is no longer necessary for him to account before the ordinary, and, therefore, his failure to do so does not deprive him of his right to commissions.

17. For a failure to make returns since the adoption of the General Statutes of 1872, an executor did not forfeit his commissions, there being no law imposing such forfeiture.

18. An executor is entitled to commissions on funds that practically passed through his hands.

19. A finding of fact by referee, overruled by Circuit judge, approved.

20. An omission by referee and Circuit judge as to a matter of fact, corrected.

------

Before ALDRICH, J., Edgefield, March, 1881.

Action by J. G. Tompkins, Lucy G. Tompkins and R. A. Tompkins, a minor, against S. S. Tompkins and J. W. Tompkins, as executors of the last will of James Tompkins, deceased, James L. Tompkins and F. A. Tompkins, commenced April 23d, 1877, for settlement of the estate of James Tompkins and for an accounting by the executors. J. G. Tompkins, a son of H. W. Tompkins, was assignee of Lucy G. Tompkins, who was assignee of H. W. Tompkins, and Lucy G. Tompkins, widow, and R. A. Tompkins, an infant, were distributees of R. Augustus Tompkins, deceased, a son of testator.

James Tompkins died in May, 1864, leaving a will, the ninth and eleventh clauses of which were as follows:

9th. Upon the payment of the sum of $5,500 to my estate, or the accounting therefor, in the division of the residuum by my sons, Franklin A. and R. Augustus Tompkins, I will, devise and bequeath unto them and their heirs forever, all my interest, being the one-third part of a tract of land in the State of Texas, county of Brazoria, and whereon my son Henry W. Tompkins now resides, and the remaining two-thirds of which are owned respectfully by my sons Henry W. of the one part, and Franklin A. and R. Augustus Tompkins of the other part.

11th. By the above bequests, I have attempted to equalize the advancements heretofore made to my children, and if any of the above negroes, given to any of my sons or grandsons,

should die before they are received, except those given my son James L., my desire is, and I do direct, that my executors substitute one of equal value for any son's negro or negroes so dying, from my negroes not herein specially disposed of. I have also included in the estimate of advancements all notes and debts due me by any of my children, which I hereby declare canceled; excepting, however, the $6,000 and the debt against Tompkins & Macmurphy, in the fourth clause of this, my will, which are to be paid by my son, James L. Tompkins, as therein directed, and also a debt of $5,500 against my sons, Franklin A. and R. Augustus Tompkins, mentioned in the ninth clause of my will.

S. S. and J. W. Tompkins were appointed executors. They were then in the Confederate army, but returned to their homes in September, 1864, and qualified. The inventory and appraisement were filed in February, 1865. Testator's heirs were his widow, Huldah; his sons, Stephen S., James L., Henry W., John W., Franklin A. and R. Augustus Tompkins, and a grandson, S. J. Tompkins. Henry W. Tompkins died in 1867, intestate, leaving a widow, Lucy G., and an infant son, R. A. Tompkins. Mrs. Huldah Tompkins died in 1868, intestate, and S. J. Tompkins died intestate in 1871, and his share in the estate of his grandfather and grandmother passed by assignment of his distributees to the plaintiff, R. A. Tompkins. The estate was very considerably in debt, and, but for several very favorable compromises made by the executors, would. have been insolvent. As it turned out, however, the debts were nearly all paid, and much valuable land was saved to the estate.

The facts bearing upon the points decided are generally stated in the opinion. To such statement should be added that there was no objection taken at the reference to the testimony of J. W. Tompkins as to his transactions with his deceased father; and that the sale of the White House place was a transfer to a creditor made under a power in the will in compromise of a large claim at twenty-five per cent. agreed to in consideration of certain services rendered by one of the executors. The case was referred to John R. Abney, Esq., to take the testimony and state the accounts. He reported, *inter alia*, as follows:

On February 27th, 1864, the testator took up a note held by the bank of Hamburg against Tompkins & Macmurphy, principal, and James Tompkins and J. W. Tompkins, sureties, by paying thereon the sum of $18,406.02. It is in testimony that the testator used $5,355 of the money of J. W. Tompkins in taking up said note. In the fourth clause of the testator's will he bequeathed said note to J. L. Tompkins, upon the condition that he pay for the claim testator has in it, in cotton, at seventy-five cents per pound. The said J. L. Tompkins does not think he ought to pay said claim in full, and urges that the testator was indebted to him by reason of his being a part owner of the Texas land with F. A. and R. A. Tompkins, and H. W. Tompkins, who owed J. L. Tompkins a large sum of money for advances, and, also, by reason of J. L. Tompkins having a separate account of $56.70 against the testator. As to the first discount, I do not think it should be allowed, since there is no evidence of the testator's being interested in the farming operations on said place; but as to the second, I think it proper to allow it, unless the said J. L. takes said claim strictly under the will. I think the said J. L. can either take under the said clause or refuse to do so. And, under the circumstances, I think it proper to require him to account for and pay the $18,406.02 according to the value of said amount in good currency, as regulated by our statute. By applying the statute the amount would be reduced down to currency of the present day, and the account would stand as follows:    *    *    *

Under the ninth clause of testator's will, a bequest or devise is made to F. A. and R. A. Tompkins, which is conditional. In such cases the right of election exists, and, in my opinion, fairness and equity would be done by permitting them to decline to assume the indebtedness therein imposed on them, and to leave the matter as it stood previous to the will. Then, if that be done, the next question is, to whom did the place belong? From the testimony it appears that no title-deed had ever been drawn. H. W. Tompkins admits that he was to be one of the purchasers, but says that he had no showing. In equity, I don't think that makes any difference. The others do not appear to have designed excluding him from the benefit of

the trade, and I apprehend that his name would have been in the deed of conveyance had the credit portion of the purchase-money been paid. If, then, he was a part owner, what portion did he own? I think it clear that it was one-third; and, furthermore, I think it equally clear that the claim which James Tompkins had over the land was an equitable mortgage in its nature. Each of the three sons were to own one-third when the land was paid for, and the credit portion was to be paid out of the proceeds of the farms on the place, in which farms the brothers were equally interested. I, therefore, think that each of them should pay one-third of the $5,500 advanced by the testator for the payment of the cash portion of the purchase-money, and their accounts for that would stand as follows:   *   *   *

It will be seen above that I have computed interest from January 1st, 1860. From F. A. Tompkins' testimony it appears that the $5,500 was loaned about that time, or before.

TANNING BUSINESS—In July, 1863, the testator and his son, J. W. Tompkins, entered in a partnership for the purpose of carrying on a tannery. This firm was dissolved in January, 1864, and the stock, &c., sold for $10,710 net. This amount was used for the purpose of taking up the Hamburg bank note against J. L. Tompkins, hereinbefore mentioned; and as J. W. Tompkins was entitled to one-half of the $10,710, the said J. L. Tompkins is due him $701.50, as may be seen by referring back to the account of J. L. Tompkins with the testator's estate for the amount paid in taking up said note.

In January, 1864, a new firm was organized for the purpose of tanning. It was composed of James Tompkins, J. W. Tompkins, and one Price, and styled Price & Tompkins. The business continued to be carried on after the testator's death, and was discontinued in the latter part of 1866. But before its ending, Price went out of the firm and transferred his interest to the estate of the testator and J. W. Tompkins, upon a settlement had with him. After Price had gone out of the firm there were liabilities against the firm, which J. W. Tompkins claims to have paid out of his own money. This being

the case, the estate is indebted to him for one-half of the amount so paid. The said firm also owed J. W. Tompkins $72, and James Tompkins $152. The accounts would be as follows: * * *

The firm obtained a patent from the United States government for tanning, which belongs to the testator's estate. I recommend that the patent and two notes, which also belong to the firm, be sold, and the proceeds applied in a settlement between them.

MERCANTILE BUSINESS—In January, 1858, James Tompkins and J. W. Tompkins formed a mercantile partnership, which lasted for two years. At its termination, the firm owed James Tompkins $207.07, and, therefore, J. W. Tompkins owed the testator one-half of said sum. The accounts stand as follows: * * *

The assets consisted of goods, notes and accounts, on which only $20 was collected. I recommend that the said notes and accounts be sold, and the proceeds thereof applied to the settlement of the above account. The testator's interest in the goods was bought by J. W. Tompkins, and about the same time J. W. Tompkins, being in the shoe business with one Jennings, also purchased Jennings' interest, and consolidated the two branches of business. The account of testator has been offered in evidence. At the end of each current year, from 1861 to 1864, both inclusive, I have scaled the account down according to the schedule regulating the value of Confederate money. The accounts stand as follows: * * *

OVERSEEING ACCOUNT—J. W. Tompkins claims that the testator was due him $600 for services rendered in overseeing the testator's plantation during the late war. I don't think, however, that it has been shown to be due even upon an implied contract. The circumstances existing at the time the services were rendered, or evidenced by the letter of James Tompkins to the comptroller general, appear to have given the government a voice in the premises, and the implied contract thereby proved, tends to show that such services were given on

the part of the government as in the nature of a gratuity.* I, therefore, do not think that the claim should be allowed.

It is impossible now to make a complete statement of the accounts, as the land is not yet sold, and the choses in action on hand uncollected are also to be disposed of; but the foregoing accounts are in full compliance with the order under which I was appointed, and are sufficient to render a full settlement easily effected so soon as all the assets of the estate are sold and the proceeds collected. The plaintiffs contend that J. W. Tompkins, executor, is liable for certain, if not all, of the deficit in the account of S. S. Tompkins, executor, but it does not appear tenable ground in view of the testimony and the law. See *Gates* v. *Whetstone*, 8 *S. C.* 244.

In making a full settlement of the estate of the testator, the share of H. W. Tompkins will be charged with all liabilities, just as if it had not been assigned. The assignee took the said share subject to such charges as were proper against H. W. Tompkins. See *Code,* § 135. I recommend that the land be sold on salesday in November. * * *

I further recommend that the creditors of the testator's estate, who have not been paid, be called in to prove their claims, or be required to file the same.

To this report the plaintiffs filed the following exceptions:

1. Because the referee erred in holding the estate of testator liable to J. W. Tompkins in the sum of half the amount of the liabilities of the firm of Price & Tompkins, to wit, the sum of $1,268.42.

2. Because the referee erred in holding that the estate of testator is indebted to J. W. Tompkins in the sum of $1,127.61 on account of the tannery.

3. Because, in respect to the tannery, the report is, in other respects, erroneous.

4. Because the referee erred in allowing J. W. Tompkins an interest in the Tompkins & Macmurphy note, paid by testator.

5. Because the referee erred in holding J. L. Tompkins in-

---

* This was an exemption from service in the army to act as overseer for his father.—REPORTER.

debted to the estate of testator only in the sum of $1,717.42 on account of the Tompkins & Macmurphy note, and because, in other respects, in reference to the said note of Tompkins & Macmurphy, the report is clearly erroneous.

6. Because the referee erred in holding H. W. Tompkins indebted to the estate of testator in the sum of $4,271.60, or in any other sum, on account of the sum of $5,500 advanced by testator for the purchase of a tract of land in Texas.

7. Because the referee erred in holding the estate of testator indebted to J. W. Tompkins in the sum of $3,939.23, on account of the mercantile business.

8. Because the referee erred in allowing J. W. Tompkins commissions on the proceeds of the sale of the White House place in 1873, to wit, on the sum of $3,716.18, when the said sum did not pass through his hands.

9. Because the referee erred in allowing J. W. Tompkins credit for the sum of $2,700, claimed to have been paid by him on account of the judgment of Jennings, Smith & Co., in the year 1876, the said judgment not being authorized by law, and being, if authorized by law, irregular, null and void, and because, if paid, was not paid out of individual funds.

10. Because the referee erred in allowing S. S. Tompkins credit for the sum of $7,662.93, claimed to have been paid out in 1869, whereas, in that sum is included the payment of the identical Jennings, Smith & Co. judgment, embraced in the exception next above.

11. Because the referee erred in not holding J. W. Tompkins equally and jointly liable with S. S. Tompkins for the amount of the proceeds of the sale of one lot of cotton in Liverpool, to wit, the sum of $11,923.

12. Because the referee erred in allowing the executors any commissions after the year 1866, no annual returns having been made after that time.

13. Because the referee erred in not holding the executors responsible for the notes and accounts on hand at the death of testator, no evidence being introduced showing them to have been worthless or doubtful, and no effort having been made to collect all of them.

14. Because the referee erred in holding the executors liable for the sum in Confederate treasury notes on hand at the death of testator, to wit, the sum of $15,535, of which only the sum of $1,700 was charged to S. S. Tompkins.

15. Because the referee erred in not holding the executors liable, to some extent at least, for the sum of $9,550.90 in Confederate bonds, on hand at the death of testator, in 1864.

16. Because, if the estate of testator was indebted to J. W. Tompkins on account of the mercantile business in the sum of $3,939.23, or in any other sum, the referee erred in not canceling it by the Confederate money on hand at the time of testator's death.

17. Because the referee erred in allowing J. W. Tompkins to testify to the transactions between him and his testator as to the mercantile account, and because the said account was barred by the statute of limitations.

18. Because the referee erred in allowing defendants to amend without giving plaintiffs an opportunity to reply.

19. Because, in regard to the mercantile business, the referee erred in not giving the amount in Confederate money that was reduced, nor the rate of the reduction, to gold.

20. Because the referee erred in allowing J. W. Tompkins credit in gold for the sum of $95.90 on account of taxes paid for P. L. Tucker, in 1865, when the amount was paid in Confederate money, and should have been reduced to gold, according to law.

21. Because the referee erred in not adjusting the rights of the parties amongst themselves, in obedience to the order of reference.

22. Because the report of the referee is, in other respects, contrary to the evidence and the law.

Exceptions of J. W. Tompkins—

1. Because the referee erred in not deducting the payments made in each current year before striking a balance.

2. Because the referee erred in not charging to the estate the amount found due this defendant for money furnished by said J. W. Tompkins to pay the Tompkins & Macmurphy note,

testátor having appropriated the note and disposed of it by his will.

3. Because the referee erred in not allowing this defendant compensation for services rendered as overseer.

4. Because the referee erred in reducing this defendant's accounts against the testator, as if the charges were made in Confederate currency, when the items charged in said accounts were charged at gold prices.

5. Because the referee erred in not allowing this defendant his part of the account of H. W. Tompkins due Jas. Tompkins & Son, and in not charging testator's share of said account against the said H. W. Tompkins.

6. Because the report of the referee is contrary to law and evidence in other respects.

Exceptions of S. S. Tompkins—

1. Because the referee erred in not deducting the payments made by the defendant for each current year before striking a balance to bear interest for the years in which said payments were made.

2. Because the referee erred in charging this defendant and F. A. Tompkins with the nominal value of the currency received by them for cotton instead of the value of such currency in constitutional money at the time received; and, further, because he demonetized gold in his statement of the account of R. A. Tompkins for cotton sold by him, though it was but the logical consequence of his mode of charging this defendant and F. A. Tompkins.

3. Because the referee erred in charging this defendant with interest, after the order of Chancellor Lesesne for him to account, on the money received by him during and after the year in which said order was made. See *Clark* v. *Tompkins*, 1 *S. C.* 119.

The Circuit decree was as follows:

This case was heard on exceptions to the report of Mr. John R. Abney, referee. The report is very long—seventy-seven pages—containing evidence, accounts and conclusions of law and

fact. When a case is referred in which matters of fact are to be ascertained and accounts balanced, the findings of the referee, like the verdict of a jury, are conclusive on the court, unless the findings of fact are contrary to the evidence, or the statements of the account show error on their face. The exceptions to the report number thirty-one in all; hence, the labor of investigation has been much more difficult than that of decision.

Mr. James Tompkins, an eminent and wealthy citizen of Edgefield, departed this life in May, 1864, leaving of force his last will, by which he appointed his two sons, the defendants, his executors. He, with his sons, had been engaged in mercantile pursuits, a tannery, the purchase of land and various moneyed transactions. Hence, as will be seen by the report, the referee had much labor in sifting the testimony and adjusting the accounts. The main subject of controversy, however, was the sale of one hundred and thirteen bales of cotton in Liverpool. From that sale J. W. Tompkins received $1,775, and S. S. Tompkins $10,148.47. It is contended the executors are jointly liable for this amount. The referee was directed to take testimony, state the accounts between the executors and the estate, and between the parties; to ascertain the amounts due by the executors, and each of them, to the parties respectively; to report at what time and upon what terms the real estate should be sold, and any special matter. The referee has laboriously performed that duty.

The deceased was reputed to be a man of wealth, and doubtless, but for the misfortunes of the war, his estate would have been amply sufficient to meet all its liabilities, but, like many other estates, it proved to be insolvent. His son and executor, S. S. Tompkins, whom I have known from his early manhood, a gentleman of irreproachable character and of the highest integrity, seems to have had the chief management of the estate, and I have no doubt has acted throughout with an eye single to the best interest of all concerned. He is evidently very sensitive on the subject of his management, but I do not think has cause of uneasiness, for his frank explanation and the earnestness he has displayed throughout must disarm the most censorious and convince the most suspicious that his every effort

has been to preserve his father's memory, advance the fortunes of his children and make the best settlement in his power for the creditors. I think it is but simple justice to give this expression of opinion here, because from the feeling displayed by Mr. Tompkins at the hearing, he is greatly moved, as I am sure no one will suspect him of improper motive or conduct.

I repeat, the main discussion was on one exception, which applies to the sale of one hundred and thirteen bales of cotton in Liverpool. This question is, I think, settled by the case of *Gates* v. *Whetstone*, 8 *S. C.* 244. In that case all the preceding authorities on the liabilities of co-executors are very well grouped, and the rule is announced that " in this State the courts have not held an executor liable for the acts of his co-executor to which he has not contributed in some direct and active way, so as by his interference to afford not only countenance, but coöperation." The facts on which the referee has based his findings are briefly these : This cotton was stored on one of the plantations of the testator. Incendiary fires were so frequent that Mr. S. S. Tompkins became solicitous for its safety, and suggested to his brother, J. W. Tompkins, co-executor, the propriety of removing it to Augusta. In this Mr. J. W. Tompkins acquiesced ; had the cotton hauled to the river, and it was shipped to Augusta.

After the war, the factors who had the cotton in charge, shipped it to Liverpool and sold it. An account was opened by the factors with the executors, who were credited with the amount of the sales. Mr. S. S. Tompkins drew $10,148.47, and Mr. J. W. Tompkins $1,775. Mr. S. S. Tompkins says : "The cotton was sold by my individual order, and not by concurrence of my co-executor." Mr. J. W. Tompkins says : "When I drew the $1,775, I was under the impression that I had individual funds in the hands of the factors ; at that time I did not know the cotton had been sold ; did not learn it until 1868 or 1869 ; the shipping of the cotton was the act of my co-executor ; when I drew the $1,775, I supposed it would be charged to my individual account, and not to me as co-executor." There is a good deal of testimony on this head, but these are the salient points of the evidence of the executors, the actors in

this transaction; they both appear to speak with frankness and candor, I think. Mr. S. S. Tompkins says: " I do not recollect if I consulted my brother about the shipment of the cotton, but I have no doubt he would have acquiesced if I had."

I have looked over the evidence carefully, and my conclusion is, that it establishes the following facts: 1. That J. W. Tompkins agreed with S. S. that the cotton was not safe on the plantation; that it should be sent to Augusta, and he superintended the removal and shipment. 2. That he did not know of the shipment to Liverpool and sale. 3. That he did not know the proceeds of the sale were credited to him and his co-executor. 4. That when he drew the $1,775 he supposed he had funds of his own, in the hands of the factors, to pay it. 5. That he was not consulted by his co-executor when he drew the balance, nor did he know what disposition he made of the money. 6. That he lived in Cokesbury; that his father had entire confidence in his brother, his co-executor; that he was the older and a lawyer, and that he desired to leave the whole management of the estate in his hands, being unwilling to qualify as executor.

Now, I cannot see how J. W. Tompkins has " contributed in some direct and active way, so as by his interference to afford not only countenance, but coöperation." He did not know when the cotton was shipped to Liverpool and sold. He did not know that the proceeds of the sale were in the hands of the factors, and credited to him and his brother, as executors. When he drew for the $1,775, he expected the drafts to be paid out of his individual funds. He did not know that his co-executor drew the balance, or what he did with it. How, then, can it be said that he contributed actively and directly to the act of his co-executor? I see no reason to disturb the finding of the referee on this fact, and the exception is overruled.

As to the first exception, this is also a question of fact. It was stated in the argument that no exception was taken as to the competency of J. W. Tompkins as a witness, nor does it appear by the report that such exceptions were made at the reference. If this be so, the fact was fully established by the proof, and there is no error in the finding. The exception is overruled.

Query: Without deciding the objection as to the competency of the witness, is it not too late to make the exceptions after the coming in of the report? It is like objecting to the verdict of a jury on evidence that was permitted to go to them without challenge at the trial.

Second exception. The referee has found that a contract was to be performed at the death of the testator; the death dissolved the copartnership as to all future contracts, but I see no error in the finding of the referee as to the contracts existing at the time of the death. This exception is overruled. And so are the third, fourth and fifth exceptions. If the referee was satisfied from the evidence that this payment was made with partnership funds, I see no error in the finding, and these exceptions are overruled. The sixth and seventh exceptions embrace questions of fact and matters of account; the referee had the witnesses and books before him; he had a much better opportunity to judge what was the truth and right of the case than I have, and I will not disturb his findings. The exceptions are overruled.

The eighth exception must be sustained. If the money did not pass through the hands of the executor, J. W. Tompkins, he incurred no liability, and I do not see on what principle the referee allows commissions. It was the result of a compromise of a debt in which no money passed: simply an exchange of papers. The ninth exception must be overruled. It was no part of the inquiry referred to the referee, to try the validity of the judgment. It was found that the executors paid it in good faith; they regarded it as a valid claim; and it was certainly binding on the estate until it was set aside. The tenth exception must be sustained; it seems to be evident that the referee has committed an error here.

The twelfth exception is overruled. When I was commissioner in equity, the practice was general where an estate was taken into the Court of Equity on a bill for account, the returns to the court of ordinary ceased, because, while the accounting was going on before the commissioner, there was no necessity to undergo the expenses of another before the ordinary. Commissions were always allowed. The nineteenth exception must be sustained in part. I can very well see how, in view of the

universal calamity that had befallen the country, and the state of public opinion in Edgefield, the executors may have concluded there was no use to incur the expense and trouble of trying to collect these old debts; they reason, if the juries interpose no obstacle, the stay law will prevent, and probably the referee shared this opinion. But there should have been an inquiry; some, if not all, may have been collected. Nor do I think it right to charge the whole to the executors. Let there be a further inquiry.

The fourteenth, fifteenth and sixteenth exceptions must be sustained; the value of Confederate money and securities that came into the hands of the executors was a proper charge against them, and should have been allowed. As to the seventeenth exception, I am in doubt if the code applies; the books were the evidence, not the witness, J. W. Tompkins. These books were as much evidence against one partner as the other. All were equally bound by them; the entries of one were the entries of the other; each had the right to correct errors or mistakes, and if one partner allows a charge made against him in his lifetime without complaint or objection, it seems hard and unjust, the moment the breath leaves the body, the books—his books—shall not prove that account. It was as much his act as the act of his partner, and it is the account, the silent witness, that speaks, not the surviving partner. The exception is overruled.

The eighteenth, nineteenth and twentieth exceptions I cannot determine; the report does not furnish me sufficient evidence to form a satisfactory judgment. The nineteenth and twentieth are denied; these must go back for further inquiry. I am sorry that severe indisposition prevented me from writing out my opinion when the argument was fresh in my memory; it was due to the earnestness, zeal and ability with which it was pressed, but my state of health, during the court and the succeeding court in Columbia, prevented. It is ordered that the report go back to the referee, or some other, as Mr. Abney is out of the county, if the counsel desire, to be reformed on the principles herein announced.

From this decree plaintiffs and the two defendants first named appealed upon the following exceptions :

Plaintiffs' exceptions—

1. Because his Honor, the presiding judge, erred 'in deciding that the estate of James Tompkins, deceased, is insolvent.

2. Because his Honor, the presiding judge, erred in deciding the matter of fact that J. W. Tompkins simply superintended the removal and shipment of one hundred and thirteen bales of cotton, whereas, it appears from the evidence of J. W. Tompkins himself, that the said J. W. Tompkins actually took possession of the said cotton, had it entirely within his own control, and removed and shipped it upon his own responsibility.

3. Because his Honor, the presiding judge, erred in deciding as matter of fact that J. W. Tompkins did not know of the shipment of said cotton to Liverpool and the sale thereof.

4. Because his Honor, the presiding judge, erred in deciding that J. W. Tompkins did not know that the proceeds were credited to him and his co-executor.

5. Because the court erred in deciding that when J. W. Tompkins drew the $1,775 he supposed he had funds of his own in the hands of the factors to pay it.

6. Because his Honor erred in deciding that J. W. Tompkins " was not consulted by his brother when he drew the balance, nor did he know what disposition he made of the money."

7. Because his Honor erred in deciding that J. W. Tompkins " lived in Cokesbury ; that his father had entire confidence in his brother, his co-executor ; that he was the older and a lawyer, and that he desired to leave the whole management of the estate in his hands, being unwilling to qualify as executor."

8. Because his Honor erred in not holding J. W. Tompkins equally and jointly liable with S. S. Tompkins for the amount of proceeds of the sale of said lot of cotton sold in Liverpool, to wit, the sum of $11,623.

9. Because his Honor erred in deciding the estate of testator is liable to J. W. Tompkins in the sum of one-half the amount of the liabilities of the firm of Price & Tompkins, to wit, the

sum of $1,268.42, and also in deciding that this was a question of fact.

10. Because his Honor erred in deciding that the estate of testator is indebted to J. W. Tompkins in the sum of $1,127.61 on account of tannery business.

11. Because his Honor erred in overruling the third, fourth, fifth, sixth, seventh and ninth exceptions taken by plaintiffs to the referee's report.

12. Because his Honor erred in deciding that the twelfth and seventeenth exceptions to the, referee's report, submitted by plaintiffs, must be overruled.

Executors' exceptions—

1. Because his Honor erred in holding the executors accountable for any sum for the notes and accounts not collected, the same, or receipts of attorneys therefor, having been produced at the reference and proven uncollectable by the executors, and in the absence of any proof showing that the said notes and accounts, or any of them, were collectable or solvent.

2. Because his Honor erred in holding said executors liable for anything on account of Confederate treasury notes and bonds on hand at death of testator, the proof showing that the testator had invested his ward's funds in them, and executors regarded them as belonging to another trust. See *Clark* v. *Tompkins*, 1 *S. C.* 119.

3. Because his Honor erred in not ruling upon and sustaining the joint exception of said executors to the referee's report, the following being said exception, viz.: Because the referee erred in not deducting the payments made in each current year, before striking a balance to bear interest for the year in which said payments were made.

J. W. Tompkins' exceptions—

1. Because his Honor erred in not considering and sustaining the defendants' exceptions to the report of the referee herein.

2. Because his Honor erred in sustaining the plaintiffs' eighth exception to the report of the referee, the proof being that the defendant effected the compromise through his individual influ-

ence, and borrowed a large sum of money individually to make the compromise.

3. Because the Circuit judge erred in sustaining the plaintiffs' sixteenth and nineteenth exceptions to the said report of the referee, and in recommitting the twentieth exception to said referee.

Exceptions of S. S. Tompkins—

1. Because his Honor erred in sustaining plaintiffs' exception No. 10, objecting to the credit given to S. S. Tompkins in 1869, of $7,662.93, there being no evidence to impeach any of the vouchers or the validity of any of the debts paid, except the admission of the defendant, S. S. Tompkins, that the sum of $1,500 of that sum was paid by his co-executor, and properly credited to him by the referee.

2. Because his Honor erred in not considering and sustaining this defendant's second exception to the referee's report, to wit: "Because the referee erred in charging this defendant and F. A. Tompkins with the nominal value of the currency received by them for cotton instead of the value of such currency in constitutional money at the time received; and, further, because he demonetized gold in his statement of the accounts of R. A. Tompkins for cotton sold by him, though it was but the logical consequence of his mode of charging this defendant and R. A. Tompkins."

3. Because his Honor erred in not considering and sustaining the defendant's third exception to the referee's report, to wit: Because the referee erred in charging this defendant with interest after the order of Chancellor Lesesne for him to account on money received by him during and after the year in which said order was made. See *Clark* v. *Tompkins*, 1 *S. C.* 119.

*Messrs. B. W. Bettis, F. H. Wardlaw,* for plaintiffs.

*Messrs. S. S. Tompkins, W. T. Gary, Ernest Gary,* for defendants.

July 12th, 1882. The opinion of the court was delivered by

McIVER, A. J.   James Tompkins departed this life on May 9th, 1864, having first duly made and executed his last will and testament, whereby he appointed his two sons, the defendants, S. S. and J. W. Tompkins, executors. Owing, however, to the fact that these executors were both absent in the Confederate service, they did not qualify until September 25th, 1864, and the appraisement of the estate was not made until February 14th, 1865, a very short time before the termination of the recent war.

This action was commenced on April 25th, 1877, for the purpose of obtaining from the executors an accounting, and effecting a final settlement of the estate of the testator. The referee, to whom it was referred to take and state the accounts of the executors, as well as between the several parties, made his report, to which all parties filed exceptions, and the case came before the Circuit judge to be heard on said report and exceptions, and from his decree all parties have appealed. Without stating in detail the various grounds of appeal, we propose to consider the several questions which we understand are raised by the various grounds of appeal.

The first, and one of the most material questions in the case is, whether the executor, J. W. Tompkins, should be made liable to account for anything more of the proceeds of the sales of certain cotton belonging to the estate which had been sent to Liverpool, than the amount which actually went into his hands. It seems that the testator left, at the time of his death, on his plantation, a considerable lot of cotton, something over one hundred bales, and the executors, fearing that it would be lost or destroyed if allowed to remain there, on account of the disturbed and unsettled condition of things in this State at the close of the war, determined that it should be shipped to Augusta, Georgia, and the executor, J. W. Tompkins, superintended the removal and shipment.

Some time afterwards, it was shipped to Liverpool by the directions of the other executor, S. S. Tompkins, and sold, and the proceeds of the sale were placed to the credit of the estate on the books of Warren & Co., factors and commission mer-

chants of Augusta. Of these proceeds, J. W. Tompkins drew, at different times, and in different amounts, sums amounting in the whole to $1,775, with which he has been charged; and the balance of the proceeds, amounting to something over $10,000, was drawn by the other executor, S. S. Tompkins; and the question is, whether J. W. Tompkins shall be charged, in his account as executor, with the whole amount, or only with the amount actually drawn by him.

It is well settled that one executor is not liable for funds which went into the hands of his co-executor, unless it is made to appear that he has paid them over to his co-executor, or has joined in the misapplication of them, or has joined in a receipt, or done some other act which enabled his co-executor to receive the funds. *Atcheson* v. *Robertson*, 3 *Rich. Eq.* 137; *Gates* v. *Whetstone*, 8 *S. C.* 246, where the authorities upon this subject are collected. We see no evidence in this case of any act done by J. W. Tompkins which enabled his co-executor to receive the proceeds of the sales of the cotton. Either of the executors had the authority to order the cotton shipped and sold, and when the proceeds of the sale were placed to the credit of the estate, either of the executors had the right to draw on such proceeds, and one could not prevent the other from so doing. We are, therefore, unable to perceive any ground upon which J. W. Tompkins can be made to account for that portion of the proceeds of the sales of the cotton which was drawn by the other executor.

The next question is, whether any of the parties can be made liable to the estate for the sum of $5,500 advanced by the testator to make the cash payment on the Texas lands. In the view which we take of this matter, it is not important to determine which of the sons of testator were interested in the purchase of these lands, or in what proportions they were interested. The testator evidently supposed, when he made his will, that, whatever may have been the original scheme, or who were the parties to it, the eventual arrangement was that he was to have a one-third interest, his son, H. W. Tompkins, a third, and that the remaining third belonged jointly to his sons, Franklin A. and R. Augustus Tompkins. It turned out, however, that

no title had ever been obtained for these lands, nothing having been paid on the purchase-money, except the amount advanced by the testator to make the cash payment, and that the land was surrendered to the vendor, Smith.

Whether this would have given the testator a claim on those of his sons for whom he advanced the money, need not be considered, for any such claim was released by the express terms of the eleventh clause of the will, in which the testator, after stating that, by the preceding bequests, he had attempted to equalize the advancements previously made to his children, uses this language : " I have also included in the estimate of advancements *all notes and debts* due me by any of my children, which I hereby declare canceled, excepting, however, the $6,000 and the debt against Tompkins & Macmurphy in the fourth clause of this, my will, which are to be paid by my son, James L. Tompkins, as therein directed; and, also, a debt of $5,500 against my sons, Franklin A. and R. Augustus Tompkins, mentioned in the ninth clause of my will." If, therefore, any indebtedness existed on the part of any of the sons, to the testator, growing out of the advance made by him to meet the cash payment on the Texas lands, such indebtedness is expressly canceled by the terms of the eleventh clause of the will.

It is argued, however, that the indebtedness of $5,500, on the part of the two sons, Franklin A. and R. Augustus, is expressly excepted, and that they, therefore, remain liable to the estate for the same. We do not so understand it. The debt against them, which is excepted, is the debt which the testator supposed he was creating against them by the terms of the ninth clause of his will, and not the indebtedness growing out of the original transaction. Hence, we do not see how any charge can be made against any of the sons for any indebtedness which any of them may have incurred to the testator by reason of his having advanced the money for the cash payment on the Texas lands, because all such indebtedness is canceled by the express terms of the eleventh clause of the will. Nor do we see how any charge can be made against Franklin A. and R. Augustus Tompkins by reason of the debt mentioned in the ninth clause of the will, because no such debt could arise unless these two sons accepted

the devise given by the ninth clause, which, of course, they have not done, and will not do, as the thing devised turns out not to be the property of the testator.

The next point made is that J. W. Tompkins, under section 415 of the code, was not competent to testify as to any transactions with the testator. This objection came too late, and, therefore, it is unnecessary to consider whether it could have been sustained, even if taken at the proper time.

Our next inquiry is, whether the claim of J. W. Tompkins against the estate for one-half of the losses resulting from the tanning business can be sustained. The facts presented in the record are not sufficient to enable us to determine this question. The original partnership between the testator and his son, J. W. Tompkins, for the purpose of carrying on the tanning business, seems to have been formed in 1863, and was dissolved in January, 1864, when a new partnership was formed, composed of the testator, his son J. W. Tompkins, and one Price.

This partnership was, of course, dissolved on May 9th, 1864, by the death of the testator, but the business was continued after that time by the survivors, the allegation being that the partnership was then under large contracts with third parties which it was bound to perform. Price subsequently transferred his interest in the partnership to the estate of the testator and the other partner, J. W. Tompkins, and retired from the concern. The business of the partnership, when finally wound up, resulted in a loss of something over $1,200, for one-half of which the surviving partner, J. W. Tompkins, claims that the estate is liable to him, he having paid the liabilities of the firm.

The partnership was dissolved on May 9th, 1864, by the death of the testator, and the rule is, that after that time the surviving partner could continue the business only so far as was necessary to settle existing demands and complete transactions begun, but unfinished, at the time of the dissolution, but no further. As is said in *Gow Part.* 231 : "From the nature of a partnership, engagements may be contracted which cannot be fulfilled during its existence, exposed, as it is, to sudden and arbitrary terminations ; and the consequence, therefore, must be, that, for the purpose of making good outstanding engagements,

of taking and settling all the accounts, and converting all the property, means and assets of the partnership, existing at the time of the dissolution, as beneficially as may be for the benefit of all who were partners, according to their respective shares and proportions, the legal interest subsists, although, for all other purposes, the partnership is actually determined.

In this case it does not appear how the losses were incurred, whether in fulfilling contracts existing at the time of the dissolution, and in a legitimate effort to wind up the affairs of the partnership, or whether they were the result of new business undertaken after the dissolution. There must, therefore, be an inquiry as to this point, and so much of the losses as are properly traceable to the effort to fulfill contracts existing at the time of the dissolution, and which the partnership was bound to perform, or to expenses incurred in a legitimate effort to wind up the affairs of the partnership, will constitute a legitimate partnership debt, and the estate will be chargeable with its proper proportion thereof. But so far as such losses resulted from any new business undertaken after the dissolution, they are not chargeable to the estate of the testator.

There seems to have been one item charged twice by the referee against the estate of the testator, viz.: The amount ($72) claimed to have been paid by J. W. Tompkins for one month's board of six hands, inasmuch as it appears in the general tan-yard account, and is also made a separate charge against the estate. This, also, will be inquired into and rectified if it has, in fact, been twice charged.

The next point is as to the mercantile account claimed by J. W. Tompkins as a charge against the estate. The correctness of this charge depended largely upon a question of fact, and we see no reason for interfering with the conclusion of the referee, concurred in by the Circuit judge, except as to the matter of scaling this account. It does not necessarily follow, that a contract should be scaled because it was made during the war. The question is, whether the contract was made with reference to Confederate States' notes as a basis of value, and, until that is made to appear, there is no ground for applying the scale fixed by the act. We see no evidence in this case that this

account was contracted with reference to Confederate States' notes. as a basis of value, and, on the contrary, the inference would be, from the prices charged for many of the articles, that it was not.

It is urged, however, that interest on this account should not have been allowed. There is no exception raising this distinct point, and it is not, therefore, properly before us. We may say, though, that while it is true that open accounts do not bear interest, yet sometimes equity allows interest upon demands, as to which interest is not recoverable at law, upon the principle that it would be inequitable to withhold it. *Pettus* v. *Clawson*, 4 *Rich. Eq.* 103. We can, then, very well understand why the referee and the Circuit judge should have thought that it was but just and equitable to allow it in this instance, inasmuch as interest had been charged upon the accounts of the executors with the estate, as well as upon the accounts between the several parties.

As to the claim for overseers' wages, we see no reason for interfering with the finding of fact by the referee concurred in by the Circuit judge.

The next question is, whether the executors should have been charged with the Confederate bonds and Confederate treasury notes on hand at the death of the testator. It will be observed that these assets were not money in the legal sense of the term, and should, therefore, be treated as any other personal property. It must also be remembered that, owing to the condition of things existing at the time of the testator's death, the currency of the war, and the absence of the executors in the Confederate service, together with the disturbed and unsettled condition of things generally, these assets did not come into the hands of the executors until a very short time before the end of the war, when they lost what little value they may have previously had. It seems to us, therefore, that if these assets became valueless in the hands of the executors without any fault upon their part, and without some evidence that they were used, or could have been used, for the benefit of the estate, the executors should not be charged with them.

As has been said, they did not come into the hands of the

executors until a very short time before the war terminated, and there is no evidence that, within that short time, they could have been used in payment of debts of the estate, or otherwise made available. Indeed, in the condition in which the country then was, it is not at all likely that they could have been so used; and even if they had possessed the legal attributes of money, it would, perhaps, have been hazardous for the executors to have appropriated such money to the payment of any particular debt, when the estate seemed inevitably doomed to insolvency, before they had taken time to look around and ascertain the rank and amount of the heavy debts due by the estate.

It is urged, however, that, at least, the claims now presented by the executor, J. W. Tompkins, should have been extinguished by the Confederate treasury notes on hand. But these assets went into the hands of the other executor, and he certainly would not have been justified in applying them to simple contract claims of his co-executor, when he knew that there were very heavy outstanding specialty claims against the estate, with every prospect that the assets of the estate would prove insufficient for the payment of its debts. We see no ground, therefore, for charging the executors, or either of them, with the Confederate bonds or notes left by the testator, especially when the executor who was principally active in the management of the estate, and who, according to the testimony, was possessed to the fullest extent of the testator's confidence, testifies that he understood that these assets were investments made by his father, of the funds of his wards, and did not really belong to the estate.

Our next inquiry is, whether the estate should be held liable to J. W. Tompkins for the amount furnished by him to the testator to take up the note of Tompkins & Macmurphy to the bank of Hamburgh. It seems that the testator and J. W. Tompkins were the sureties of Tompkins & Macmurphy on a note to the bank of Hamburgh, and that, a short time before his death, the testator took up this note, using for that purpose some money belonging to J. W. Tompkins, not amounting, however, to one-half of the sum paid on the note. How this could give J. W. Tompkins any claim against the estate of the testator, we are at a loss to conceive. He and the testator were

both liable to the holder of the note for the full amount of it, and, as between themselves, each was liable for one-half, and unless J. W. Tompkins furnished more than one-half of the amount used in taking up the note, he could have no claim against the estate of the testator.

It is contended, however, that inasmuch as the testator, by his will, undertook to dispose of the note, the transaction must be regarded as a loan by J. W. Tompkins to the testator of the amount advanced by him, and, therefore, that the estate is liable to refund to J. W. Tompkins the amount borrowed from him. It is true that the testator does undertake, by his will, to give to his son, J. L. Tompkins, one of the firm of Tompkins & Macmurphy, the note in question, but the bequest is upon the condition "that he account or pay to my estate for the sum paid by me and interest, in fair cotton, at seventy-five cents per pound." This gave to J. L. Tompkins the right of election, and, as he has not and, we are given to understand, will not accept the bequest upon that condition, it necessarily fails, and the matter stands as if no such bequest had been made, and leaves the transaction as it originally stood, by which the testator was entitled to a claim against Tompkins & Macmurphy for the amount paid by him as their surety, and J. W. Tompkins was entitled to a similar claim against Tompkins & Macmurphy for the amount advanced by him for the purpose of taking up the note.

The next question to be considered is, whether the executors should be held liable for the uncollected notes and accounts due the testator at the time of his death. These assets were produced or accounted for by receipts of attorneys with whom they had been lodged for collection, and the evidence on the part of the executors is, that they tried to collect them, but were unable to do so. There is no evidence that any one of them could, by proper diligence, have been collected; and in the absence of such evidence, and under all the circumstances surrounding this case, the condition of the country, and the disasters resulting from the war, we do not see any sufficient ground to warrant the conclusion that these uncollected assets should be charged against the executors. As was held in *Pettus* v. *Clawson*, 4 *Rich. Eq.*

92, before an administrator should be charged with notes marked by the appraisers on the inventory as good, there should be some proof of their collection or of negligence in collecting; and the same doctrine would apply to executors. To have required proof that the debtors had been sued to insolvency, or to have taken up each one and offered evidence as to his insolvency, would have involved an expense to the estate, which, in our judgment, would not have been justified.

The next question is as to the credits allowed for the payment of the judgment in favor of Jennings, Smith & Co. We see no error in the conclusion reached by the Circuit judge in reference to this matter. Even though there may have been technical informalities in the judgment, yet there is no evidence that the debt on which the judgment was recovered was not a valid claim against the estate, which has been extinguished by the executors, and they, therefore, should have credit for the amount paid by them. There does, however, seem to have been a mistake in crediting $1,500 of this amount to the executor, S. S. Tompkins, which he admits to be an error; and the Circuit judge has fallen into an error in sustaining plaintiffs' tenth exception to the referee's report *in toto*, while it should have been sustained only as to the $1,500 erroneously credited to S. S. Tompkins, there being no evidence assailing any of the other credits allowed.

The next question is as to the mode of stating the accounts of the executors, it being alleged, in their behalf, that the referee erred in not deducting the payments made in each year before striking a balance to bear interest. The position taken by the executors is correct, and is fully sustained by the case of *Pettus* v. *Clawson*, 4 *Rich. Eq.* 92.

Our next inquiry is, whether there was any error in ascertaining the amounts chargeable to R. A. Tompkins and F. A. Tompkins on account of cotton received by them from the estate in 1865. R. A. Tompkins received two bales of cotton on July 24th, 1865, and sold them for $215.16, in gold; and F. A. Tompkins received two bales on November 24th, 1865, which he sold for $443.90, in currency. In adjusting the accounts of the several parties, the referee converted the amount, for which

R. A. Tompkins sold his two bales, into currency, by adding thereto the premium on gold, thus ascertaining the amounts chargeable to these parties by the same standard of value. In this we see no error. The other transactions between the parties, and the dealings of the executors with the estate, since the termination of the war, were, doubtless, made in currency, and not in gold; and, hence, it seems to us fair and equitable that the amounts with which R. A. Tompkins and F. A. Tompkins were chargeable for this cotton should be ascertained by the same standard of value.

Next, it is contended by the executors that they should not be charged with interest after the order of Chancellor Lesesne was made, in the case of *Clark* v. *Tompkins*, 1 *S. C.* 119, requiring them to account. If it had been made to appear that the executors had collected in the assets of the estate, and retained the same in their hands unemployed to meet any balance that might be ascertained on the accounting ordered, there would have been good ground to claim an exemption from liability for interest; but as this has not been made to appear, we do not see any ground upon which the position taken by the executors can be sustained.

The next question is, whether the executors were entitled to commissions after 1866, when they ceased to make annual returns to the ordinary. There is no doubt but that, by the terms of the act of 1789 (5 *Stat.* 112), an executor forfeited his right to commissions by a failure to make the returns required by that act (*Lay* v. *Lay*, 10 *S. C.* 208); but we have always understood the rule to be, that, when an executor or administrator is required to account before the Court of Equity, it was no longer necessary for him to make returns to the ordinary, inasmuch as a court of superior jurisdiction had assumed the duty of taking the account.

In this case it appears that these executors were required to account before the Court of Equity by an order passed in the case of *Clark* v. *Tompkins*, 1 *S. C.* 119, which case seems to have been heard in June, 1867, and although it does not distinctly appear when the bill was filed, it must, necessarily, have been in the latter part of 1866 or early in the year 1867. This,

we think, rendered it unnecessary for the executors to make annual returns to the ordinary after that time, and their failure to do so should not deprive them of their right to commissions. In addition to this, the act of 1789 was repealed on February 10th, 1872, by the adoption of the General Statutes, and the provision inserted therein, in lieu of the act of 1789, contains no clause by which an executor or administrator loses his right to commissions by a failure to make annual returns; and, therefore, in any event, the executors would be entitled to commissions since 1872. *Davidson* v. *Moore*, 14 *S. C.* 266.

In regard to the commissions allowed by the referee on the proceeds of the sale of the White House place, the Circuit judge seems to have fallen into an error of fact in saying that no money passed through the hands of the executor, for, as we understand the testimony, the proceeds of the sale did, practically, pass through the hands of the executor. We think, therefore, that the Circuit judge erred in sustaining the exception relating to this matter.

The only remaining error alleged is the omission to charge the assignees of H. W. Tompkins with the amount of an account due by him to James Tompkins & Son. This matter seems to have been overlooked, both by the referee and the Circuit judge. From the testimony before us, this seems to be a proper charge against the assignees, and the accounts should be rectified accordingly.

The judgment of this court is that the judgment of the Circuit Court be modified so as to conform to the principles herein announced, and that the case be remanded to that court for such further proceedings as may be necessary to carry into effect the views herein presented.