Clifton PENNINGTON et al.,
Plaintiffs-in-Error,

v.

STATE of Tennessee, Defendant-in-Error.

Court of Criminal Appeals of Tennessee.

Dec. 20, 1971.

Certiorari Denied by Supreme Court
March 6, 1972.

Charles W. Martin, Oneida, for plaintiffs in error.

David M. Pack, Atty. Gen., Bart Durham, Asst. Atty. Gen., Nashville, Arzo Carson, Dist. Atty. Gen., Huntsville, Lee Asbury and Roy Asbury, Special Prosecutors, Jacksboro, for defendant in error.

## OPINION

MITCHELL, Judge.

On July 13, 1970 the Grand Jury in the Criminal Court of Scott County, Tennessee returned an indictment against Clifton Delbert Pennington, James Pennington, Robert Lee Lawson, and Martha Carol Pennington, charging murder in the first degree of Dr. D. T. Chambers on or about the 29th day of May, 1970.

The court found the three Penningtons indigent and appointed counsel for them. On August 22, 1970 on their motion and petition they were granted a severance and a change of venue and their case was transferred to the Criminal Court of Anderson County, Tennessee for trial.

Clifton Delbert Pennington, James Pennington and Martha Carol Pennington, who will be referred to as defendants or by name, represented by court appointed counsel, were on October 7, 1970 convicted in the Criminal Court of Anderson County, Tennessee of murder in the first degree in the slaying of Dr. D. T. Chambers on the 29th day of May, 1970. The jury fixed the punishment of Clifton Delbert Pennington and James Pennington at ninety-nine (99) years each in the penitentiary and Martha Carol Pennington's punishment at fifty (50) years in the penitentiary.

The motion for a new trial was heard and overruled on February 19, 1971 and judgment on the verdict was pronounced by the Trial Judge Honorable D. L. Hutson.

Dr. D. T. Chambers, an aged prominent physician, lived alone in his stately two story brick residence with tall white columns across the front, at Norma near the Kentucky line, in Scott County, Tennessee. Dr. Chambers, because of his feeble condition, walked with a cane and his vision was impaired to such an extent that it was ineffective without the aid of his glasses.

Late on the night of May 29, or early morning of May 30, 1970 Dr. Chambers' lifeless form was discovered lying with his body on the bed and his feet on the floor in his bedroom. The top of his face and his head had been shot away by a blast from a shotgun at close range. Particles of flesh and bone and spots of blood were on the floor and the walls of the room and pieces of his spectacle frame were found at different places on the floor. Dr. Chambers habitually kept a safe in his home and he was the only person shown to have knowledge of the combination. After his death it was necessary for skilled persons with appropriate tools to drill into the safe, where they found among other things, a memorandum of the serial numbers of his .32 caliber Smith and Wesson Special revolver, and of his shotgun.

A diligent, relentless and skillful investigation was conducted by the Sheriff's Office and the Tennessee Bureau of Criminal. Identification, together with the valuable assistance of law enforcement agencies of Tennessee, Kentucky and Indiana who worked on the case day and night. Early fragmentary information pointed the finger of suspicion toward the three defendants. It was found that the defendants Clifton Pennington, his wife Carol Pennington and his brother James Pennington had on the evening of May 29, 1970 been riding around with Robert Lee Lawson and his wife Brenda in Brenda's automobile frequenting beer taverns in the Oneida area and taking trips into Kentucky adjacent to Oneida and Scott County.

It was learned that the defendant James Pennington, immediately after the murder had returned his shotgun to his grandmother's house, where he had been living part of the time, and from which he had surreptitiously taken the shotgun the same evening and prior to the fatal shooting of Dr. Chambers. That Effie Pennington, who lived with and looked after James Pennington's grand-mother, was heard to tell James Pennington to put the gun back, and as James left the house he had something sticking down in each side of his clothes, believed to have been the shotgun which could be disassembled into three parts or pieces.

Brenda Lawson freely and voluntarily testified on behalf of the prosecution and gave the following testimony which is the basis of the State's theory.

Mrs. Lawson testified that she was twenty years old and married to Robert Lee Lawson. That on May 29, 1970 she was acquainted with Clifton Delbert Pennington, James Pennington, but until that date she was not acquainted with Clifton's wife Martha Carol Pennington. That on May 29, 1970 she and her husband were living with her mother-in-law Mrs. Daisy Lawson. That she had a 1965 Pontiac Tempest automobile that was given to her by her father. That around 5:30 or 6:00 p. m. she and her husband left in their car to go to Foster Crossroads, outside of Oneida. That they had started to go to Robert Watson's house, but they met him riding in a truck and pulled him over. That they sold him a transistor radio that he had been wanting, after which they went back to Oneida, and drove around. That it was about 20 or 25 till 7:00 P.M. That while they were driving in this vicinity they saw the defendants Clifton Pennington and James Pennington who motioned for them to stop. They had two paper sacks of beer and got into the car and went riding with them. That they rode around and drank beer and went to Kentucky. On the way to Kentucky they stopped at a tavern, that James Pennington got out and went inside. While they were there they saw a man called "Sunshine" and started talking to him. That they talked to him about 10 or 15 minutes and then James Pennington came out of the tavern with some more beer. That after they arrived back in Oneida Clifton wanted to go and get his wife. That he told her where to go and she followed his instructions. That the house where they were staying was upon a hill with a road leading up to it. That she did not drive up to the house as the road was rough. That James Pennington went up to the house. That Clifton was still drinking there. That James brought Martha Carol Pennington (Clifton's wife) back to the car and they got in the back seat where Clifton was sitting. That she turned around to be introduced to Carol and she saw James laying a shotgun in the floor. That she told him she didn't want any gun in the car and Clifton Pennington said that some man was trying to beat him up and kill him—that it was for protection. That Clifton Pennington then asked to go to Norma. That she drove to Norma past the high school, over a hill and at a grocery store Clifton said to turn. That Clifton was directing the driving. The defendants Clifton Pennington, James Pennington and Martha Carol Pennington were in the back

seat. Clifton told her to stop. That she pulled off the road in the school house drive. That the defendant Clifton Pennington said they were going to rob Dr. Chambers and that her husband asked them not to do it. That Clifton told them he was going to do it and told her and her husband that if they said anything about it or tried to leave them that he would beat them and kill their whole families to get to them. That the three defendants got out of the car with the shotgun and walked up to Dr. Chambers' house. Carol was bent over and the two men were on either side of her. That they went up to the house and to the door. That there was an upstairs light on. That the defendants knocked on the door several times. They had started to come back out when a light came on in the back and they turned around and went back up to the door and knocked again, and someone came to the door. That when the front door opened Carol ran back to the car and James Pennington or Clifton Pennington, and she thought it was James, held the gun up to whoever came to the door and they went in the house. That Carol got in the front seat. That in 5 or 10 minutes she heard a low thud-like noise and the two defendants came running out of the house. Clifton Pennington had the gun, and that she saw another gun, too. That the men got in the back seat with her husband in the middle. That they told her to get the hell out of there and not to turn on the car lights until they got around the curve, which she did. That shortly they passed a police car and Clifton said if they came back, that he had already killed one man and he would just as soon kill them. That James had a small gun a pistol with white handles, and she saw it right after they left the doctor's house. That they started to fire it out one of the windows at a house and her husband grabbed the gun. That Clifton told her to drive back to Oneida where the defendants were staying which she did. That it was around 10 minutes to 11:00. That Carol and James got out of the car and James took the shotgun back to the house. That about 10 or 15 minutes later they came back to the car (Carol and James) with Carol's little boy. That Clifton had stayed in the car. That they did not bring any clothing, but Carol brought her pocketbook. That the three defendants wanted her to drive them to a town this side of Cincinnati. That she went and filled up with gas and Clifton paid for it. That she went to her mother-in-law's house and that she went in and got a record player and a radio. That her mother-in-law was not home. That she got back into the car and drove them to a place just across the bridge from Cincinnati. That they stopped in Whitley City, Kentucky at a service station so they could go to the bathroom and when they came out James begged Clifton for the pistol so he could rob the man at the filling station, but he wouldn't let him. That they arrived at this town about 5:00 or 6:00 the next morning. That they went to Covington where Clifton and Carol had an apartment. That during this time she saw a dark spot on Jim's shoulder. That Carol took it to the bathroom and washed it out. That several times they would leave and go to Carol's mother's home and watch the news. That on Monday they went to Ludlow Kentucky to pick up Clifton's check. That after this they went to the Kentucky-Tennessee line to her mother's house, to take a record player and radio back. That they threw the pistol and cartridges in the river at the bridge that crosses over near Newport. That while they were in the apartment in Cincinnati the defendants said they had blown Dr. Chambers' head off because he told them that he didn't have a gun and they pulled the drawer open and found one. James said he told the doctor, "you lied to me," and shot him. That they got around $40.00 or $45.00 from him. That Dr. Chambers offered them $1,000.00 not to kill him. That Clifton and James laughed about this. That on Tuesday after the gun was thrown over Monday night they went to Attica, Indiana. That the defendants made several phone calls to find out if Dr. Chambers was dead and to find

out if the Sheriff was looking for them. That on the Monday that they were arrested they had gone to see a Bill "Junior" Winchester, that they had been twice before. That the defendants were always with them.

On cross-examination Mrs. Lawson testified that she and her husband moved back to Scott County from Chattanooga and that they had lived with her husband's mother since that time. That she and her husband had been in Sessions Court on check forgery charges. That she had been arrested on a charge of lewdness, which was later dropped against her. That there had been quite a lot of beer consumed from Oneida to Kentucky but that they were not real drunk. That the reason she didn't drive off at Dr. Chambers' house was because she was afraid of the threat that Clifton had made. That he also threatened them on the way to Covington. That she and her husband were never alone, that James or Clifton was always with them with a shotgun. That she was not offered any leniency by the Attorney General.

On re-direct Mrs. Lawson testified that Clifton had helped to write the checks on the forgery charge. She was asked to identify the defendants and did so by describing what they were wearing.

Robert Lawson, husband of Brenda Lawson freely and voluntarily testified and gave substantially the same testimony as his wife Brenda.

The medical examiner testified Dr. Chambers' death was the result of a shotgun wound to the head.

The defendants did not testify in the case, except James Pennington, who testified in the absence of the jury on the admissibility of the shotgun evidence.

The first assignment of error made by the defendants is to the effect that the trial court erred in ruling that there was consent given to the T. B. I. Agent Marcum for the search of the defendant James Pennington's house and the seizure of the shotgun belonging to him.

This question was carefully examined and considered by the trial judge in the absence of the jury. T. B. I. Agent John Marcum had been informed that earlier on the night the crime was committed and prior to the killing of Dr. Chambers the defendant James Pennington had taken the shotgun from the house of Emma Pennington and after about an hour he returned the shotgun to the house.

Agent Marcum went to the house of Emma Pennington where he found her in bed, that Effie Pennington was there and told him she was Emma Pennington's daughter and was looking after and caring for her mother who was old, feeble and blind and not capable of taking care of her business affairs. Effie said she had never married and had always lived there. Marcum told Miss Effie nothing about the crime except that he was looking for a weapon and had reason to believe the weapon was there and that it had been used in the commission of a crime. That Miss Effie said "the 12 gauge shotgun is here, I'll get it for you." Mr. Marcum asked her to wait he wanted to explain to her that she did not have to give him anything that he had a consent form there that he would like for her to sign before she gave him the gun and told her he could not look for the gun without her consent. She explained that she could not write her name but she made her mark witnessed by Detectives Lewallen and Jeffers. Then Miss Effie walked from the living-room through the kitchen into the back bedroom picked up the 12 gauge shotgun and handed it to Agent Marcum.

The Trial Judge found that Miss Effie Pennington, the sixty year old daughter of Mrs. Emma Pennington was actually in charge of the premises. That her mother Mrs. Emma Pennington was eighty years of age or more, and disabled so that she could not look after herself or her business affairs. That Miss Effie was giving directions to the defendant James Penning-

ton who apparently recognized her authority when she told him to not take the gun or to put it down, that he told her he had obeyed her instruction, at least he did not take the gun with her knowledge and consent. That there was no misrepresentation by Officer Marcum to Miss Effie. He was patient and considerate and told her he would not search without her consent.

■ We agree with the finding of the trial court. On questions of fact we are bound by his finding unless the evidence preponderates against it, and we find that it does not. Cusick v. State, Tenn.Cr.App., 456 S.W.2d 857; Clarke v. State, 218 Tenn. 259, 402 S.W.2d 863.

■ We hold that consent to the search was given by the only responsible person shown to be in charge of the premises namely Effie Pennington and that whatever search or seizure Agent Marcum made was legal. In fact no actual search was made. Miss Effie Pennington voluntarily got the shotgun and gave it to the officer. McCravey v. State, Tenn.Cr.App., 455 S.W.2d 174; Lester v. State, 216 Tenn. 615, 393 S.W.2d 288.

The second assignment of error made on behalf of the defendants is that there were no sufficient material facts to corroborate the testimony of the two co-defendants, Mr. and Mrs. Robert Lawson, to the degree necessary to convict plaintiffs-in-error.

When this case was argued before us at Knoxville at the October term 1971, counsel for the defendants informed us that Robert Lawson and his wife Brenda Lawson, were indicted in the same indictment with the defendants in this case but their case had been severed and they had been subsequently convicted of involuntary manslaughter upon which a sentence of eleven months and twenty-nine days had been imposed.

We point out here that the indictment in the technical record does not include the name of Brenda Lawson.

■ The Attorney General insists that Robert Lawson and his wife Brenda Lawson are not accomplices. That the Lawsons did not knowingly, voluntarily and with common intent unite with the principal offenders in the commission of the crime. There is evidence that Robert Lawson and Brenda Lawson helped the defendants in their flight from Tennessee to Kentucky and Indiana, but they contend they rendered aid to the defendants in their escape from Tennessee, under fear and duress. An accessory after the fact is not an accomplice.

In Sherrill v. State, 204 Tenn. 427, 321 S.W.2d 811, the Court said:

"The degree of evidence which shall be deemed sufficient to corroborate the testimony of the accomplice is for the determination of the jury. The law is complied with if there is some other evidence fairly tending to connect the defendant with the commission of the crime, so that his conviction will not rest entirely upon the evidence of the accomplice."

In Monts v. State, 214 Tenn. 171, 379 S.W.2d 34, the Court said:

"It is well settled in this State, by judicial decision, and in many other American jurisdictions, by statutory enactment, that a defendant cannot be convicted upon the uncorroborated testimony of an accomplice in his crime. Sherrill v. State, 204 Tenn. 427, 321 S.W.2d 811 (1959); Scott v. State, 207 Tenn. 151, 338 S.W.2d 581 (1960). As to who is an accomplice within this rule is a point upon the American cases are not in complete harmony. (E.g., see annotation in 53 A.L.R.2d 817.) The definition most often found in the cases is the one recited in Wharton's Criminal Evidence (12th Ed.) § 448 at page 229: "a person who knowingly, voluntarily, and with common intent with the principal offender unites with him in the commission of the crime." The test generally applied by the courts in this country is whether

the alleged accomplice could be indicted for the same offense charged against the defendant. Wharton's Criminal Evidence, (12th Ed.) § 448 at page 230. Casone v. State, 193 Tenn. 303, 246 S.W.2d 22 (1952)."

"In Tennessee, an accessory after the fact is not subject to indictment for the offense committed by his principal; but rather he is guilty of a separate and distinct offense defined in § 39–112 T.C.A. Thus under the generally accepted test, an accessory after the fact could not be considered as an accomplice within the rule requiring that the testimony of an accomplice be corroborated. This appears to be the result reached in all the States that have passed on this question with the exception of Arkansas and Texas. 14 Am.Jur., Criminal Law, § 112; 23 C.J.S. Criminal Law § 792; State v. Bowman, 92 Utah, 540, 70 P.2d 458, 111 A.L.R. 1393 (1937); State v. Phillips, 18 S.C. 1, 98 N.W. 171 (1904); State v. Riddell, 38 R.I. 506, 96 A. 531 (1916); State v. Umble, 115 Mo. 452, 22 S.W. 378 (1893); Levering v. Commonwealth, 132 Ky. 666, 117 S.W. 253 (1909)."

We quote from Wharton's Criminal Evidence Vol. 2, 12th Ed. 1955, Section 448:

"An accomplice is a person who knowingly, voluntarily and with common intent with the principal offender unites with him in the commission of the crime. The term "accomplice" does not include a person who has guilty knowledge, or is morally delinquent, or who was even an admitted participant in a related but distinct offense. To constitute one an accomplice, he must perform some act or take some part in the commission of the crime or owe some duty to the person in danger that makes incumbent on him to prevent its commission. An accomplice is "one culpably implicated in, or who unlawfully co-operates, aids, abets, or assists in, the commission of the crime charged.""

"The generally accepted test as to whether a witness is an accomplice is whether he himself could have been convicted for the offense, either as principal or accessory."

■ Whether the State's witnesses Robert Lawson and his wife Brenda were accomplices was a question for the jury to determine as was the question of the degree of evidence sufficient to corroborate their testimony.

No question was made concerning the judge's charge to the jury and the charge was not made a part of the bill of exceptions so we presume the distinguished and experienced Trial Judge correctly charged the jury who, either found the Lawsons were not accomplices or found their testimony was sufficiently corroborated.

In Stanley v. State, 189 Tenn. 110, 222 S.W.2d 384, the Court said:

"The sufficiency of evidence required to corroborate an accomplice is well set forth in Clapp v. State, 94 Tenn. 186, 30 S.W.2d 214, 217, as follows:

" 'The degree of evidence which shall be deemed sufficient to corroborate the testimony of the accomplice is for the determination of the jury. The law is complied with if there is some other evidence fairly tending to connect the defendant with the commission of the crime, so that his conviction will not rest entirely upon the evidence of the accomplice.'

"This Court has likewise held that rather slight circumstances may be sufficient to furnish necessary corroboration. Winfree v. State, 174 Tenn. 72, 123 S.W.2d 827.

" 'The corroboration need not be conclusive, but it is sufficient if this evidence, of itself, tends to connect the defendant with the commission of the offense, although the evidence is slight, and entitled, when standing by itself, to but little

consideration. Moreover, if the verdict is founded on slight evidence of corroboration connecting the defendant with the crime, it cannot be said, as a matter of law, that the verdict is contrary to the evidence.' Section 753, page 1271, supra."

█ We find there was adequate corroboration for the testimony of Robert Lawson and Brenda Lawson and here cite some of the specific instances in which corroboration is shown.

Boyant Sexton, Deputy Sheriff of Scott County was on duty at the Scott County Jail the evening of June 5, 1970, the telephone numbers are 663–2245 or 46. The phone rang and he answered it and a man said he was Clifford Pennington, he asked if Bernard (the Sheriff) was there and he told him he was not. He then wanted to know if they had warrants on the Penningtons for the murder of Dr. Chambers. "He said he understood they went up there and tore the damn house all to pieces." Deputy Sexton asked him where he was and he answered, "I couldn't tell you that." This was about 8:00 or 9:00 o'clock. The Lawsons testified about these telephone calls.

William Nave, Indiana State Police participated in the investigation of the death of Dr. D. T. Chambers, patrolling near Williamsport, Indiana. There was a telephone booth on Monroe Street in front of the courthouse and he saw three or four people, two of them were Clifton Pennington and his brother James Pennington, in the phone booth and one man talking on the phone and the other partially inside the booth and saw one female outside the phone booth. That he saw these same people the following Monday when they were apprehended at 402 Council Street. "We apprehended them at McDonald and Monroe Streets in Attica." "They were Clifton Pennington, his wife Martha Carol Pennington and his brother James Pennington, Brenda and Robert Lawson. The car they were in was registered to Brenda Lawson. This was June 5, 1970, Friday evening."

David Wayne Landis of the Indiana State Police assisted the Scott County, Tennessee officers in the investigation of the death of Dr. D. T. Chambers, and saw two men talking on the phone.

Stanley Kinney of the Indiana State Police assisted the Scott County, Tennessee officers in the investigation of the death of Dr. D. T. Chambers June 8, 1970. The defendants Clifton Pennington, James Pennington and Martha Pennington with Robert Lawson and Brenda Lawson were arrested as they were leaving 402 Council Street, Attica Indiana, the house of Junior Winchester. They were in a 1965 Pontiac automobile registered to Brenda Lawson. That they found some shotgun shells in the purse of Carol Pennington. Three of the shells were loaded with No. 4 shot, the fourth shell loaded with what is commonly called a deerslug or rifle slug. The fifth shell loaded with No. 6 shot. These people were kept in custody until the Scott County officers came.

Other specific instances of corroboration were: Mrs. Alice Thomas, a niece of Mrs. Emma Pennington who lived in talking distance of Miss Effie Pennington and Mrs. Emma Pennington, was in their house helping take care of her aunt, on the evening of May 29, 1970 about dark. James Pennington and Carol who is Clifton Pennington's wife came to the house. Effie is Clifton's aunt. Mrs. Thomas went into the middle door toward where Emma was, and Carol and James Pennington went into the bedroom where Carol Pennington was, she heard Carol and James talking and Effie "hollered" at James to put the gun back and he went back in there and told her he put the gun back. Carol Pennington and Joan Pennington were in there with him. When James came out he flipped his shirt open and he had something sticking down each side of his clothes, kind of long something. (The state insisted this was the disassembled shotgun concealed on James

Pennington's person.) Before that Carol and James went out and talked five or six minutes and came back. She noticed a car down at the foot of the hill at Emma's driveway. She was standing on the porch when the car came over to the house and turned. This evidence is in support of Brenda Lawson's testimony that James Pennington and Carol· Pennington came to the car and James put a shotgun in the car.

Lieutenant J. W. Mercer of the Covington, Kentucky Police Department testified he assisted T. B. I. Agent John Marcum in the investigation of the death of Dr. ·D. T. Chambers of Scott County, Tennessee. That after he contacted the owner of the place he went to the apartment of the defendant Clifton Pennington at 1517 Garrett, Covington, Kentucky. He testified he found the piece of paper exhibit 27 on the mantel in the bedroom or living-room of defendant Clifton Pennington's apartment on the paper was "663–2245 Huntsville, Tennessee." T. B. I. Agent John Marcum testified this number 663–2245 is the telephone number of the County Jail at Huntsville, Tennessee.

Agent Marcum on another occasion in company with Sheriff Bernard Brummitt of Scott County, Tennessee and state's witness Robert Lawson returned to Covington, Kentucky where Lawson directed them to a bridge, across the river, which separates the cities of Newport and Covington, Kentucky. That Lawson showed them where the pistol the defendants took from the home of Dr. D. T. Chambers was dropped into the river. They engaged the services of Captain John Beaty who does salvage operations on the river, and with the aid of a large tugboat, barges and cranes together with a large electric magnet weighing about seven tons they dragged the bottom of the river at the place pointed out by Lawson. When the powerful magnet was hoisted up from the river Dr. D. T. Chambers' .32 caliber Smith & Wesson nickle-

plated revolver was hanging onto the magnet. This was the pistol Robert Lawson and Brenda Lawson testified they saw the defendants taking away from the home of Dr. Chambers on the night of this foul murder, and which was conclusively identified as Dr. Chambers' pistol by the memorandum of the serial number of the pistol found in the doctor's safe.

The fact that the defendants after the brutal slaying of the helpless and defenseless doctor left Scott County together in the automobile of the State's witness Brenda Lawson whom they compelled to drive for them. With the further fact that they were seen together at various places by Indiana and Kentucky Officers and were all in close association staying together at the same places where they could keep a careful watch over the Lawsons is evidence that may be looked to for corroboration of the Lawsons.

The defendants' third assignment of error complains that the Trial Court erred in saying in the presence of the jury that the defendant Carol Pennington would have an opportunity to testify if she so desired.

 This incident arose when the defendant Carol Pennington improperly spoke out during the testimony of Brenda Lawson and said, "Oh Brenda, why don't you tell the truth woman? You are under oath. You're lying." The Trial Judge said, "Have your client remain quiet, Mr. Martin." Defense counsel asked for a five minutes recess to this the court replied, "I don't think it is necessary. Just have your client remain quiet. She will be given an opportunity to testify, if she wishes." This was not error but was a plain correct statement of the law or rules of procedure and probably was repeated in the court's general charge to the jury. That any defendant had a right to testify if he desired to do so but cannot be compelled to testify and no inference of guilt can be drawn

from his failure to testify. There is nothing to show that the defendant or either of them was prejudiced by what the court said.

The defendants complain in their fourth assignment of error that the Court erred in receiving in evidence certain clothing worn by the defendants on the night of the killing.

We are unable to find any merit in this assignment and it is overruled.

The defendants' fifth assignment of error is that the evidence preponderates against the defendants' guilt and in favor of their innocence. In considering this assignment we are confronted by the presumption that the defendants are guilty as found by the jury and approved by the Trial Judge. We are bound by the rule that a guilty verdict, approved by a trial judge, accredited the testimony of witnesses for the state and established their credibility, and displaced presumption of defendants' innocence, raised a presumption of their guilt, and put upon them, on appeal, the burden of showing that the evidence preponderates against the verdict, and in favor of their innocence. Anderson v. State, 207 Tenn. 486, 2nd headnote, 341 S.W.2d 385; Holt v. State, 210 Tenn. 188, 357 S.W.2d 57.

The defendants have failed to carry the burden of showing that the evidence preponderates against their guilt and in favor of their innocence.

We find that the guilt of the defendants has been clearly established by the proof.

The assignments of error are overruled and the judgment is affirmed.

We commend court appointed counsel for the able and zealous service he has rendered in representing the defendants in this case.

DWYER and RUSSELL, JJ., concur.