IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
October 24, 2006 Session

**STATE OF TENNESSEE v. RAYMOND LEE GIBSON**

**Appeal from the Criminal Court for Hamilton County**
**No. 254704     Rebecca J. Stern, Judge**

---

**No. E2006-00450-CCA-R3-CD - Filed April 27, 2007**

---

The defendant, Raymond Lee Gibson, was convicted by a Hamilton County jury of one count of manufacturing methamphetamine. On appeal, he raises several evidentiary issues for our review and argues that the evidence is insufficient to support his conviction. After review of the record, we are not persuaded that the evidentiary issues merit relief, and we hold that the evidence at trial was sufficient to support the manufacturing conviction. The judgment of conviction is, therefore, affirmed.

**Tenn. R. App. P. 3; Judgment of the Criminal Court is Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and JOHN EVERETT WILLIAMS, J., joined.

Robin Ruben Flores, Chattanooga, Tennessee, for the Appellant, Raymond Lee Gibson.

Robert E. Cooper, Jr., Attorney General & Reporter; Benjamin A. Ball, Assistant Attorney General; William H. Cox, District Attorney General; and James A. Woods, Jr., Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

The defendant stands convicted of manufacturing methamphetamine, *see* T.C.A. § 39-17-417 (2006). The conviction is based on the March 28, 2004 discovery and seizure of numerous items commonly used in the manufacture of methamphetamine inside a bathroom cabinet in an apartment located at 510 Central Avenue in Chattanooga. Melissa Miller had leased the apartment, where she resided along with her son, her sister, and the defendant. The defendant was not present in the apartment when police officers found the incriminating items, and he was not arrested until several months later. The defendant made no inculpatory admissions or incriminating statements when arrested.

On August 18, 2004, the Hamilton County Grand Jury returned a one-count presentment charging the defendant, Ms. Miller, and Aimee Mallett, who was Ms. Miller's sister, with unlawful manufacture of methamphetamine. The defendant's case was severed from that of his co-defendants, and he was tried on June 28, 2005. A jury found the defendant guilty of the charged offense, and the trial court sentenced him to a four-year incarcerative sentence to be served consecutively to an Alabama conviction for which he received a 10-year sentence.

On appeal the defendant assails various evidentiary rulings at trial, which the State maintains were not properly objected to at trial, but the thrust of the defendant's argument is that the State's evidence is insufficient to link him to the "meth lab." As we shall explain, the evidence presented was sufficient to support the manufacturing conviction.

At trial, the State led with the testimony of Chattanooga Narcotics Detective Phillip Narramore. The defense stipulated to Detective Narramore's qualifications as a trained narcotics officer, but at the trial court's suggestion, the State asked the detective to elaborate on his education involving methamphetamine manufacturing operations (MMOs). Detective Narramore testified that during his training at the Drug Enforcement Administration's Academy in Quantico, Virginia, he learned how methamphetamine was made, and he actually "cook[ed]" methamphetamine in a laboratory setting. Furthermore, he received extensive training in dismantling MMOs and the critical safety factors that must be followed. The detective described the toxic fumes and explosive fumes commonly encountered.

Detective Narramore testified that the MMOs commonly seen in Hamilton County are categorized as "red phosphorous labs," which produce phosgene gas.[1] A required ingredient is pseudoephedrine or ephedrine. Detective Narramore testified that he had previously been accepted as an expert on MMOs.

On March 28, 2004, Detective Narramore was the assigned "site safety officer" with the responsibility of supervising the dismantling of an MMO found at 510 Central Avenue, Apartment 914. The detective went inside the apartment and personally observed component items for an MMO, such as iodine, tubing, muriatic acid, hydrogen peroxide, mason jars, coffee filters, and aluminum foil. These items were discovered "underneath the bath sink in the bathroom with [the cabinet] screwed shut." In Detective Narramore's opinion, the materials and equipment he found under the sink on March 28, 2004, indicated an MMO.

On cross-examination, Detective Narramore testified that he did not participate in any arrests at the apartment; another officer served as the lead investigator. Detective Narramore was involved in collecting and cataloguing the items found under the sink. He explained that the items

---

[1] The trial transcripts reflect that when the detective offered this testimony, the defense requested a bench conference to register a complaint that the State was straying beyond what was needed to set forth the detective's expertise with MMOs. The trial court instructed the State to limit its examination. The defense did not request that the testimony be stricken or that the court admonish the jury regarding the testimony.

could not be submitted for fingerprint testing because "once [the items] are inside a methamphetamine lab, they are contaminated [and a] biohazard." The detective further explained that once the contaminated items are removed, Occupational Safety and Health Administration (OSHA) guidelines require them to be sent to Ferguson-Harbour, a company that performs chemical cleanup. The defense showed the detective a photograph of the defendant, and the detective testified that he did not recognize the photographed individual.

On redirect examination, Detective Narramore related that pursuant to OSHA regulations, Ferguson-Harbour destroyed the contaminated items; therefore, nothing remained of the MMO for the prosecution to physically produce for the jury's inspection.

Todd Floyd, a Chattanooga police officer formerly assigned to special investigations, narcotics division, testified that he was certified in disposal of methamphetamine and "working methamphetamine labs." In his work, Officer Floyd had interviewed "meth cooks." Many times, the officer observed blisters, scars, and burn marks on the methamphetamine cooks' hands from the chemicals used to make methamphetamine. He testified that "around their fingernails you will also start seeing a very strong yellow color and also on the palm of their hands a yellow color from dealing with the chemicals." Officer Floyd described the odor associated with an MMO as a "real acid smell" akin to the smell of "cat urine."

Officer Floyd was the first person, other than possibly tactical team members, who entered the apartment and located the MMO. Officer Floyd was dressed in a hazardous materials protective suit with an independent oxygen supply. Officer Floyd testified that upon entering the apartment, he found a bedroom on the right side and another bedroom on the left side. Each bedroom had an attached bathroom. The officer walked into the bedroom and bathroom on the left; in the bathroom, he discovered that the cabinet doors underneath the sink vanity had been "fastened with wood screws." He removed the screws to open the cabinet and discovered an MMO. According to procedure, he personally carried all of the components outside to a secure perimeter, where the components were inventoried and later picked up for chemical cleanup. No attempt was made to fingerprint any of the contaminated components, and Officer Floyd testified that he was not trained to take fingerprints.

Officer Joseph Harper, who was trained in dismantling MMOs, testified about the procedure when an MMO is discovered. With the discovery at Apartment 914, he related that the apartment manager was alerted, and the officers went to every apartment and directed any occupants to evacuate the area. Officer Harper established the outside perimeter where Officer Floyd brought the MMO components to be inventoried and later picked up for disposal by Ferguson-Harbour. Officer Harper read from his inventory the items taken from the apartment, which included Mason jars full of used coffee filters with iodine residue, 25 feet of tubing, unused coffee filters, a hot plate, a six-ounce bottle of iodine, 500 matchbooks used to extract red phosphorous, funnels, glass pipe, "a thirty gallon tote" used to mix substances, Coleman fuel, various jars containing liquid substances, a can of Red Devil lye, denatured alcohol, a bottle of hydrogen peroxide, aluminum foil, an empty

muriatic acid container, a crock pot, and "white sludge" suspected of being pseudoephedrine. Officer Harper took photographs at the scene, and he identified each one for the jury.

Melissa Miller, the individual who rented Apartment 914, testified for the State that she had twice used methamphetamine. In March 2004, she, her son, her sister, and the defendant were living in the apartment. Ms. Miller testified that her bedroom and bathroom were on the right side of the apartment, that a common dining room, living room, and kitchen were in the middle of the apartment, and that the defendant and Ms. Mallett used the bedroom and bath on the left side of the apartment.

Ms. Miller testified that she never entered the defendant's bedroom. She said that "[f]or the most part . . . [she] was real bad sick . . . [with] a broken back" and that she "stayed in bed most of the time." Regarding unusual things that occurred in the apartment, Ms. Miller recalled once returning from a meal and "smell[ing] fingernail polish remover very strong." Also, at times she detected a "real strong odor of cat urine." Ms. Miller testified that the clothes her sister and the defendant wore smelled like cat urine, as did their bedroom. Coffee filters appeared in the apartment, which was unusual because she did not have a coffee maker. She saw Red Devil lye in the house, which she denied purchasing. Ms. Miller testified that the defendant's hands "looked really nasty like they had been burned real bad" and that his clothes "smelled like cat urine or some kind of chemical smell."

On cross-examination, the defense established that Ms. Miller had a pending methamphetamine manufacturing charge arising from the March 28, 2004 incident. She was scheduled to appear in court on her charges after the defendant's trial, and she insisted that she expected no leniency from the State based on her testimony. She was aware that the defendant was not arrested until several months after the MMO discovery; she stated that the defendant was arrested after she "informed the police where he was."

The final proof the State offered was a stipulation with the defense that the apartment in question was located in Hamilton County.

The defendant did not testify or offer any evidence on his behalf.

From the evidence presented, the jury found the defendant guilty of manufacturing methamphetamine.

## SUFFICIENCY OF THE EVIDENCE

When a defendant challenges the sufficiency of the convicting evidence on appeal, this court begins with the premise that a guilty verdict "removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Williams*, 913 S.W.2d 462, 466 (Tenn. 1996). The State is not only entitled to the strongest legitimate view of the

evidence on appeal, but it is also entitled to all reasonable and legitimate inferences that may be drawn from the evidence. *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999). In determining the sufficiency of the evidence, this court does not reweigh the evidence, *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978), and we do not substitute our inferences for those drawn by the trier of fact, *State v. Pike*, 978 S.W.2d 904, 914 (Tenn. 1998). Consequently, when the sufficiency of the evidence is challenged, "the standard for review by an appellate court is whether, after considering the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Smith*, 24 S.W.3d 274, 278 (Tenn. 2000) (quoting *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999)); *see also Jackson v. Virginia*, 443 U.S. 307, 318-19, 99 S. Ct. 2781, 2791-92 (1979).

These rules apply to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). An accused may be convicted exclusively on circumstantial evidence only when the facts and circumstances are so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, *State v. Crawford*, 225 Tenn. 478, 482, 470 S.W.2d 610, 612 (1971). In other words, "[a] web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." *Id*. at 484, 470 S.W.2d at 613.

Our review of the record in this case discloses that the State's evidence, attributable to the testimony of Detective Narramore and Officers Floyd and Harper, did not demonstrate that the defendant owned, leased, resided, or visited the property where the components for an MMO were discovered; indeed, the officers' testimony never addressed anyone's ownership, leasehold, residency, or visitation of the property. None of the officers recognized the defendant, and the officers did not connect the purchase or assembly of any of the seized items to the defendant. Nothing was introduced to show that methamphetamine was discovered in the apartment.

Officer Harper mentioned that they were "running . . . a gas tech" indicating "that the environment was extremely hazardous" and had "contaminates in the area." The State, however, failed to call anyone from the Tennessee Bureau of Investigation or some other forensic chemical testing facility to testify that items seized from the apartment tested positive for methamphetamine or the presence of pseudoephedrine. Pseudoephedrine, a required element in manufacturing methamphetamine, was not listed among the inventoried items enumerated by Officer Harper in his testimony. At one point, Officer Harper expressed his suspicion about the chemicals discovered, and he added that "once these items [were] sent off to the TBI, they were tested positive for methamphetamine." However, the trial court sustained the defense objection and instructed the jury that the officer was "not an expert in chemistry and can't really make conclusions about chemistry or the makeup of chemicals or what lab reports may or may not do, what the TBI may or may not do."

Moreover, the State offered no testimony regarding the defendant's appearance when he was arrested; no incriminating statements were attributed to the defendant, and the State never

mentioned whether the defendant was in possession of any methamphetamine at the time of his arrest or at any other time.

Accordingly, all of the evidence that inculpated *the defendant* was supplied by Ms. Miller. To be sure, she testified that she never entered the defendant's bedroom, and she did not suggest that the defendant was the individual who purchased or brought the coffee filters and Red Devil lye into the apartment. She certainly never claimed to have witnessed the defendant manufacturing methamphetamine or possessing or using that drug – or any other illegal substance.[2] Ms. Miller did not testify about the officers' discovery and seizure of the items from her apartment. Furthermore, she never specifically identified who was in the apartment at that time, and it is unknown from her testimony when the defendant was last in the apartment. Her testimony, however, did establish (1) that the defendant had been residing in her apartment, (2) that her sister and the defendant were cohabiting and using the bedroom and bathroom on the left side of the apartment where the items seized were located, (3) that their bedroom smelled like cat urine, as did her sister's and the defendant's clothing, and (4) that the defendant's hands "looked really nasty like they had been burned real bad."

No evidence that pointed the accusatory finger at the defendant corroborated Ms. Miller's testimony. In Tennessee, a defendant cannot be convicted solely upon the uncorroborated testimony of an accomplice. *See State v. Bane*, 57 S.W.3d 411, 419 (Tenn. 2001).

> There must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, *but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity*. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately *tends to connect* the defendant with the commission of the crime charged.

*Bane*, 57 S.W.3d at 419 (quoting *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994)) (emphasis added).

We are not persuaded, however, that Ms. Miller met the legal definition of an "accomplice." The supreme court in *State v. Bough*, 152 S.W.3d 453 (Tenn. 2004), explained,

> An accomplice is one who knowingly, voluntarily, and with common intent participates with the principal offender in the commission of a

---

[2] The court sustained the defense objection and struck Ms. Miller's testimony that she knew that her sister and the defendant had a history of manufacturing methamphetamine.

crime. *State v. Lewis*, 36 S.W.3d 88, 94 (Tenn. Crim. App. 2000); *Conner v. State*, 531 S.W.2d 119, 123 (Tenn. Crim. App. 1975). To satisfy the definition of an accomplice, it is not enough that the witness merely possess guilty knowledge, is morally delinquent, or even participated in a distinct but related offense. *See State v. Lawson*, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990).

*Bough*, 152 S.W.3d at 464.

The evidence in this case falls short of demonstrating that Ms. Miller knowingly, voluntarily, and with common intent participated with the defendant in manufacturing methamphetamine at the apartment. She never admitted witnessing the defendant's making methamphetamine, much less knowingly and voluntarily participating in its manufacture. Ms. Miller never testified that she was aware that the odor of cat urine and burns on an individual's hands could be indicators that the individual was manufacturing methamphetamine. However, even if such information could be imputed to her, it proved no more than her guilty knowledge or moral delinquency.

In addition, we do not regard Ms. Miller to be an accomplice merely because she was jointly indicted with the defendant. *See Ripley v. State*, 189 Tenn. 681, 227 S.W.2d 26, 29 (1950). Language can be found that a test for whether a witness is an accomplice is whether the witness could have been indicted for or convicted of the offense. *See Bough*, 152 S.W.3d at 464 ("could have been convicted"); *Pennington v. State*, 478 S.W.2d 892, 897 ( Tenn. Crim. App. 1971) ("could be indicted"). Certainly, no evidence appeared in this case that Ms. Miller stood convicted of methamphetamine manufacturing, and under the "could be indicted" formulation, the evidence that could have led to an indictment must have been, but was not, shown. The mere fact of indictment, as in this case, without some underlying evidence to gauge the basis for the indictment is insufficient.

That said, we still must consider whether the evidence, so viewed, is legally sufficient to support the manufacturing conviction. The defendant was convicted of manufacturing a Schedule II controlled substance in violation of Code section 39-17-417(a)(1), which states that it is a crime for a person knowingly to manufacture a controlled substance. *See* T.C.A. § 39-17-417(a)(1) (2006). As provided by Code section 39-17-408(d)(2), methamphetamine is a Schedule II controlled substance. *Id*. § 39-17-408(d)(2). At the time of the offense, "[m]anufacture" was defined as the

> production, preparation, propagation, compounding, conversion or processing of a controlled substance, either directly or indirectly by extraction from substances of natural origin, or independently by means of chemical synthesis, and includes any packaging or repackaging of the substance or labeling or relabeling of its container, except that "manufacture" does not include the preparation or compounding of a controlled substance by an individual for the individual's own use.

*Id*. § 39-17-402(15) (amended 2005). As emphasized in *State v. David Long*, No. W2003-02522-CCA-R3-CD, slip op. at 7 (Tenn. Crim. App., Jackson, Mar. 4, 2005), "[t]he conduct prohibited by the statute is that of '*manufacturing*.'" (Emphasis added.)

We have canvassed relevant case law regarding methamphetamine manufacturing convictions. A clear case of methamphetamine manufacturing arose in *State v. Franklin Darnell Brown, Jr.*, No. W2003-01863-CCA-R3-CD (Tenn. Crim. App., Jackson, Sept. 16, 2004), when the defendant was "caught in the act of manufacturing methamphetamine" as evidenced by "a plastic bag containing ephedrine tablets, coffee filters, plastic tubing, rubber gloves, and pliers in the defendant's sleeping quarters," by "a white box that had been used as a container for ether or anhydrous ammonia, salt, glass containers, funnels, spoons, paper towels, cotton balls, coffee filters, and Rooto, a product mixed with salt to 'gas' methamphetamine," in the shed behind the defendant's house, by "small containers with white residue believed to have been used for crushing pills and a glass jar of nearly finished methamphetamine," and by "a twenty-pound propane tank that had been used to store anhydrous ammonia," in a nearby log cabin. *Id*., slip op. at 1-2, 3. At trial, one of the officers testified that the glass jar of partially manufactured methamphetamine found in the shed required only "fifteen to thirty minutes . . . gas time and drying time" to be a finished product. *Id*., slip op. at 2. The court concluded that the interruption of the defendant's advanced manufacturing efforts by the police did not defeat his conviction. *See id*., slip op. at 3.

In *State v. Michael Joseph Cook*, No. W2002-01924-CCA-R3-CD (Tenn. Crim. App., Jackson, June 27, 2003), drug task force officers discovered evidence of methamphetamine production in a remote wooded area accessible to the public. The officers monitored the area, and at a later time, they found the defendant and a companion in the area with the defendant's truck parked nearby. *See id*., slip op. at 1. The officers smelled a strong odor of ether, and approximately six feet from the truck, they found a closed one-gallon glass jar containing some of the ingredients necessary to manufacture methamphetamine. They also discovered a short distance from the truck an empty container that smelled like anhydrous ammonia, empty boxes of suphedrine, and a duffle bag containing ether, pliers, "liquid fire," coffee filters, tubing, glass jars, and lithium batteries. A baggie containing processed methamphetamine had been hidden underneath the front bumper of the defendant's truck. *Id*., slip op. at 1-2. This court sustained the defendant's manufacturing conviction, pointing to evidence (1) that, with the exception of anhydrous ammonia, all ingredients necessary to manufacture methamphetamine were found in the immediate area of the defendant's vehicle, (2) that packaging for suphedrine was near the truck, (3) that the closed glass jar likely contained anhydrous ammonia and crushed suphedrine tablets, (4) that a nearby empty container smelled like ammonia, (5) that the duffle bag contained MMO materials, and (5) that processed methamphetamine was hidden in the defendant's vehicle. *See id*., slip op. at 4.

In *State v. Blair*, 145 S.W.3d 633 (Tenn. Crim. App., 2004), the defendant was found at a campsite with much of the equipment and chemicals commonly used to make methamphetamine; iodine and anhydrous ammonia, however, were not among the chemicals found. *See id*., 636-37. One of the officers at the scene detected the odor of ether emanating from a closed cooler, which, when opened, was found to contain a "red bucket containing a liquid and something

floating in the liquid." *Id*. Subsequent testing identified the floating substance in the red bucket as pseudoephedrine. One of the state's experts testified that the pseudoephedrine in the red bucket was an immediate precursor to making methamphetamine, and in the expert's opinion the defendant was manufacturing methamphetamine. *See id*., at 637. On appeal, the court sustained the defendant's conviction even though processed methamphetamine was not found at the camp site and even though pseudoephedrine was not, at the time, classified by statute as a immediate precursor to pseudoephedrine.[3] The court explained that "the fact that pseudoephedrine is not listed does not mean it is not [in fact] an immediate precursor to the drug, i.e., a substance from which the drug is derived," and the court held that "based upon the expert's opinion and the evidence found at the campsite, a rational jury could have found beyond a reasonable doubt that the defendant was guilty of manufacturing methamphetamine." *Id*., at 639.

In *State v. James Castile*, No. M2004-02572-CCA-R3-CD (Tenn. Crim. App., Nashville, June 28, 2006), a Ramada hotel front desk clerk called the police to report a chemical smell coming from one of the rooms. The defendant refused to consent to the officers' searching his room, but after obtaining a search warrant, officers discovered "numerous items and substances associated with the manufacturing of methamphetamine, including eleven packages of psuedoephedrine, a hot plate, a notebook containing a formula for methamphetamine, water purifier, five thermometers, a coffee grinder, tubing, plastic baggies[,] three bags of methamphetamine with a total weight of about 4.75 grams[,] . . . chemicals common to the methamphetamine manufacturing process, such as acetone, methyl alcohol, drain opener, salt[,] and two jars of a clear substance later identified as liquid ephedrine in a chemical solvent." *Id*., slip op at 2, 5. The defendant admitted manufacturing methamphetamine for his personal use, but he insisted that at the time of his arrest that he "did not have the anhydrous ammonia or the lithium required to complete the process." *Id*., slip op. at 6. The defendant conceded, however, "that he had completed the first step in the process by extracting the pseudoephedrine in a solution that was contained in the jars found at the hotel room." *Id*. On appeal, the court affirmed the defendant's conviction even though the defendant was not in possession of two products required to complete the process. Relying on the officers' testimony and the defendant's admissions, the court ruled that "it is clear a reasonable jury could have concluded that the appellant was at least engaged in the 'preparation' 'of a controlled substance.'" *See id*., slip op. at 11.

On the other hand, in *State v. David Long*, No. W2003-02522-CCA-R3-CD (Tenn. Crim. App., Jackson, Mar. 4, 2005), the court held that the evidence was legally insufficient to support a manufacturing conviction and remanded the case for trial on the lesser included offense of attempted manufacturing of methamphetamine. *See id*., slip op. at 4, 6-8. In that case, the defendant was stopped while driving, whereupon the officer "immediately noticed boxes and blister packs of pseudoephedrine scattered on the floor and a can of ether starting fluid sticking out of a

---

[3] In 2005, the legislature amended Code section 39-17-402 by adding a new subsection (13) and redesignating former subsections (13) through (26) as (14) through (27). *See* 2005 Tenn. Pub. Acts ch. 18, § 17. The new subsection (13) provides that "immediate methamphetamine precursor" means, in relevant part, "ephedrine, pseudoephedrine, or phenylpropanolamine." *Id*. We note that no corresponding change was made to code section 39-17-408(f), which lists "phenylacetone" as the immediate precursor to methamphetamine. *Id*. § 39-17-408(f)(1) (2006).

plastic bag." *See id.*, slip op. at 2. A search of the trunk "yielded fourteen blister packs of Sudafedrin, six boxes of Sudafed, and approximately ten boxes of Wal-fed, with corresponding receipts dated October 9, [the same day as the stop]" along with "three cans of starting fluid, aluminum foil, . . . phosphorous matches[,]. . . instructional materials for the manufacture of methamphetamine, which the proof suggested were obtained from internet sources, and a drug pipe in the briefcase." *Id.* In reversing the defendant's conviction, the court explained,

> At trial, [the arresting officer] admitted that he did not smell ether or ammonia at the scene or see any lab equipment utilized in the manufacturing of methamphetamine in the truck. Moreover, the record fails to establish any evidence of production, compounding, converting, processing, or extraction of any controlled substance. Indeed, none of the cold medicines had been removed from the blister packs or boxes in which they had been purchased.

> The facts relevant to manufacturing establish that the Appellant was in possession of a large quantity of cold remedy medications containing pseudoephedrine, three cans of starting fluid, recipes for manufacturing methamphetamine, phosphorous matches, and a small quantity of methamphetamine. The Appellant asserts that there was no evidence whatsoever that he had begun the process of manufacturing. He concedes that while he "may have fully intended to manufacture a controlled substance at some future date," he was not manufacturing when arrested.

> The State relies upon *State v. Barton Derek Grande*, No. W2002-01893-CCA-R3-CD (Tenn. Crim. App. at Jackson, Sept. 2, 2003), for the proposition that the evidence is sufficient to support the conviction if a defendant is in possession of the necessary ingredients for manufacturing methamphetamine in addition to the finished product. We find this reliance misplaced based upon the facts of the case. In *Grande*, the defendant was found in a car from which a strong odor, consistent with the manufacturing of methamphetamine, was emanating. Inside the trunk, officers found ether, lithium batteries, sulfuric acid, bags of pseudoephedrine in powder form, pseudoephedrine in tablet form, a propane cylinder, tubing, jars containing an ether and anhydrous ammonia mix, and a quantity of methamphetamine.

> The facts in the present case are clearly distinguishable. The conduct prohibited by the statute is that of "manufacturing." From the facts before us, we cannot conclude that the Appellant did more

-10-

than possess some, but not all, of the ingredients necessary for the
manufacture of methamphetamine.

*Id*., slip op. at 7.

We distill from these cases several principles to guide us through what is obviously a fact-intensive inquiry. The absence of processed methamphetamine or the interruption of an obviously ongoing chemical process that otherwise would yield a finished product is not fatal to the State's prosecution. Also, a successful prosecution does not require proof that a defendant was in possession of each and every ingredient necessary to manufacture methamphetamine. Conversely, mere possession of some ingredients necessary to manufacture methamphetamine, *without more*, does not translate automatically into illegal manufacturing. In *David Long*, the ingredients possessed by the defendant were unopened and/or had not been obviously used or previously consumed, and the officer found no "lab equipment utilized in the manufacturing of methamphetamine in the [defendant's] truck." *David Long*, slip op. at 7. Whether the presence of precursor ingredients is required for a manufacturing conviction has not been squarely addressed. *See State v. Bradley Lonsinger*, No. M2003-03101-CCA-R3-CD (Tenn. Crim. App., Nashville, Jan. 5, 2005) (defendant charged and convicted for the *attempted* manufacture of methamphetamine; evidence sufficient even though no processed methamphetamine and no ephedrine or pseudoephedrine were found in the house; deputies found 37 items associated with the manufacture of methamphetamine, and two of the HCL generators were still smoking when the deputies discovered them). However, evidence that a precursor is undergoing chemical alteration, such as soaking in a chemical solvent, carries substantial weight.

In the instant case, the most glaring difficulty is the State's failure to present a forensic chemist to verify the presence of methamphetamine or pseudoephedrine in the "white sludge" or other liquids discovered in Ms. Miller's apartment. The trial court sustained the defense objection to Officer Harper's suspicions or opinions regarding the chemical composition of the seized items. However, the officers were permitted to give their opinions that what they discovered in Ms. Miller's apartment was a "methamphetamine lab." We have carefully reviewed the officers' testimony in this case and the photographic exhibits of what the officers discovered. Unlike in *David Long*, many of the items had been partially or completely used, such as a tin container and a Mason jar containing used coffee filters with iodine residue; a pyrex dish, funnels, and a glass pipe with iodine residue; striker plates torn from matchbooks soaking in a liquid; multiple Mason jars containing various amounts of liquid-type substances; a one-gallon can of denatured alcohol, one-half full; a one-gallon can of camp fuel, one-eighth full; a 32-ounce bottle of hydrogen peroxide, one-half full; and an empty muriatic-acid quart container. Also, distinct from *David Long*, "lab equipment" was found in the apartment, such as a gas generator consisting of a two liter bottle with tubing attached. From this evidence and with the officers' expert testimony about the process of manufacturing methamphetamine, we are convinced that reasonable jurors could find beyond a reasonable doubt that methamphetamine had been manufactured in Ms. Miller's apartment.

-11-

Even so, the State never elicited specific testimony regarding when the last manufacturing process had occurred in the apartment. Because, however, the evidence did show that a "gas tech" that was operated at the scene indicated "that the environment was extremely hazardous" and had "contaminates in the area," it is reasonable to conclude that the manufacturing process had occurred recently.

The last aspect of evidence sufficiency we must examine is whether the State proved that the defendant was the individual who manufactured the methamphetamine. The record is silent on the whereabouts of the defendant the day that the officers entered the apartment. We are mindful that Ms. Miller provided her observations concerning the defendant's hands and of the odor of his clothing, but she never specified when she made these observations.

We recognize that we are not dealing with the first-hand perceptions of the officers at the scene; the officers did not testify about the defendant's hands or that his clothing smelled like cat urine. These observations were supplied by Ms. Miller, who never professed knowledge of how to manufacture methamphetamine. *See also State v. Marise*, 197 S.W.3d 762 (Tenn. 2006) (under statute requiring State to prove chemical composition of anhydrous ammonia, held that "olfactory observations of the officers may not be enough, standing alone, to convict"). Without more, a witness's description of an odor as "cat urine" is somewhat tenuous and speculative as a means of carrying the State's burden of proving that the defendant manufactured methamphetamine. For instance, in *State v. Patricia Marie Jenson*, No. M2003-02848-CCA-R3-CD, slip op. at 2 (Tenn. Crim. App., Nashville, June 21, 2005), one of the officers who participated in the raid of a "crack house" testified that the crack-cocaine smoke he encountered was "disgusting," and he compared the smell to that of "male cat urine." In *Bradley Lonsinger*, slip op. at 3, 7, one of the arresting officers described the odor associated with methamphetamine manufacture as similar to the odor of battery acid.

In the present case, however, Ms. Miller not only described an odor emanating from the defendant that, according to the evidence, could be associated with manufacturing methamphetamine, but also she described his hands as marred by burns, a circumstance that also, according to the evidence, suggests manufacturing methamphetamine. We hold that the convergence of these circumstances provides a core of identity evidence that supports the verdict. The jury had the prerogative of believing Ms. Miller's testimony, and the jury obviously chose to do so. That testimony along with other evidence in this case is sufficient to support the conviction.

## EVIDENTIARY ISSUES

The defendant raises several evidentiary issues. He argues that the testimony regarding the "general characteristics" of an MMO and "meth cooks" was more prejudicial than probative, thereby rendering the jury's verdict a product of speculation. He neither elaborates on this argument nor provides citations to the record where proper objections were registered. This issue has been waived. Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b); *see* Tenn. R. Evid.

103(a)(1) (providing that a timely objection for purposes of preserving the issue for appeal must state "the specific ground of objection if the specific ground was not apparent from the context").

The defendant also argues that the State failed to offer any lab technicians to identify the nature or composition of the substances seized from the apartment. This argument, couched as an evidentiary complaint, is moot inasmuch as we have addressed the State's failure of proof in this particular case as not defeating the sufficiency of the evidence to support the manufacturing conviction.

Last, the defendant complains that Ms. Miller was not listed as a witness on the presentment and that the State failed to provide a proper disclosure to the defense that Ms. Miller would be testifying at trial. Code section 40-17-106 states, "It is the duty of the district attorney general to endorse on each indictment or presentment, at the term at which the same is found, the names of the witnesses as the district attorney general intends shall be summoned in the cause, and sign each indictment or presentment name thereto." T.C.A. § 40-17-106 (2006). This statute is directory only. *Houston v. State*, 567 S.W.2d 485 (Tenn. Crim. App. 1978). Failure of the State to list witnesses on the indictment is not a sufficient basis for reversal of a judgment, absent a showing of prejudice to an accused. *State v. Crabtree*, 655 S.W.2d 173 (Tenn. Crim. App. 1983).

In our opinion, the State was not require to list Ms. Miller as a witness on the presentment. She was an indicted co-defendant, although her case was severed from that of the defendant. The purpose of Code section 40-17-106 is to limit the possibility of surprise and to provide the defendant a basis upon which to prepare a theory of defense against his accusers. *See State v. Street*, 768 S.W.2d 703, 710-11 (Tenn. Crim. App. 1988). That danger did not exist in this case.

**CONCLUSION**

Based upon the foregoing, the defendant's conviction for manufacturing methamphetamine is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE