IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs May 5, 2020

### STATE OF TENNESSEE v. MICHAEL RYAN BOGGS

**Appeal from the Circuit Court for Benton County**
**No. 18-CR-30          C. Creed McGinley, Judge**

___

### No. W2019-01289-CCA-R3-CD

___

The Defendant, Michael Ryan Boggs, was indicted for theft of property valued at more than $10,000 and less than $60,000, a Class C felony; aggravated burglary, a Class C felony; possession of a firearm by a convicted felon, a Class E felony; and possession of a firearm during the commission of a dangerous felony.  See Tenn. Code Ann. §§ 39-14-103(a), -14-105(a)(4), -14-402, -14-403(a), -17-1307(b)(1)(B), -17-1324(a).  Following a jury trial, the Defendant was acquitted of the firearms offenses and convicted of the theft of property and aggravated burglary offenses.  The trial court imposed a sentence of ten years on each count, to be served concurrently.  On appeal, the Defendant challenges the sufficiency of the evidence relative to his identity as a perpetrator of the burglary, arguing that the accomplice testimony was incredible and not adequately corroborated.  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and ALAN E. GLENN, JJ., joined.

Lance R. Chism (on appeal), Memphis, Tennessee, and James W. Melton (at trial and on appeal), Camden, Tennessee, for the appellant, Michael Ryan Boggs.

Herbert H. Slatery III, Attorney General and Reporter; Katharine E. Decker, Assistant Attorney General; Matthew F. Stowe, District Attorney General; and K. Michelle Morris-Deloach and Thomas Tansil, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

FACTUAL BACKGROUND

This case arises from the April 27, 2017 daytime burglary of John and Martha Killens's home, for which the Defendant and his friend, co-defendant Kelly Wallace, were

both charged. Co-defendant Wallace subsequently entered a guilty plea for a reduced charge in exchange for her testimony.

Mr. Killen testified that on April 27, 2017, he was alerted to the break-in by his mother, who lived next door. She was in Mr. Killen's home to let the family dogs outside when she noticed the door from the house to the garage was open; the door to the garage was generally kept closed and all the exterior doors locked with dead bolts. The police responded, and it became apparent that intruders had broken the back window of a black truck parked in the driveway, used the garage door opener inside the truck, and gained entry to the house through the unlocked door inside the garage. The garage and master bedroom were the main targets of the burglary.

Mr. Killen testified that a Polaris Ranger all-terrain vehicle (ATV), various tools, a logging chain, jumper cables, ratchet straps, work gloves, an air compressor, hunting clothes and boots, fishing reels and lures, a Glock 9mm handgun containing seven or eight bullets, vehicle key remotes, a large quantity of jewelry, and women's clothing were taken. He noted that his wife's engagement ring was worth more than $7,000 alone and that some of the pieces were family heirlooms that could not be replaced. In all, more than sixty items were taken with a total value of about $39,000, according to Mr. Killen. A list of the items with approximate values that Mr. Killen submitted to his insurance company was received as an exhibit. A Kindle Fire tablet not belonging to anyone in the Killen family was found in the garage; a forensic technology expert determined that the Defendant was listed as the user, and the Defendant's Amazon account was linked to the tablet. The Kindle was last used the morning of April 27, 2017.

On April 28, 2017, Mr. and Ms. Killen went to pawn shops and jewelry stores seeking to recover Ms. Killen's jewelry; while in one jewelry store, Ms. Killen recognized some of her jewelry being sold by a man inside the store, who was thereafter arrested. The man was later identified as Jeffrey Pearcy. Mr. Killen was not previously acquainted with Mr. Pearcy, the Defendant, or co-defendant Wallace.

The Killens recovered Ms. Killen's wedding ring, a necklace, a bracelet, and "several other chains" from Mr. Pearcy. The sheriff's department later recovered several additional items from the Defendant's car and the ATV from an uninvolved third party.

Benton County Sheriff's Investigator Ricky Pafford testified that he responded to Mr. Killen's 911 call at the jewelry store on April 28, 2017, and he interviewed Mr. Pearcy at the Sheriff's Department. Mr. Pearcy indicated that he bought the jewelry from the Defendant. Later that evening, Investigator Pafford interviewed the Defendant, who indicated that co-defendant Wallace had called him and asked for a ride; she came out of a house carrying several bags; co-defendant Wallace loaded the bags into the Defendant's

car; and they left. Investigator Pafford asked the Defendant "about a side by side,"[1] and the Defendant stated that he believed co-defendant Wallace took it into the woods. The Defendant gave consent for officers to search his car and noted that the bags inside belonged to co-defendant Wallace "except for an air compressor, some fishing poles, . . . [and] a pair of boots that he had bought from her." A number of items belonging to the Killens were recovered from the car. The Defendant's fiancée, Darian Flatt, also gave a statement.

At some point thereafter, the Defendant directed Investigator Pafford to a house owned by a person nicknamed "J-Rod," who was later identified as Jason Rodriguez, in an effort to locate the ATV. Mr. Rodriguez told Investigator Pafford that he had seen co-defendant Wallace and the Defendant riding the ATV on his property but that the ATV was no longer there. Officers unsuccessfully searched Mr. Rodriguez's property, which consisted of a main house and a guest house, for the ATV. Investigator Pafford noted that an older vehicle outside the guest house "had been shot with a rifle or a pistol or something" and had "holes in the windows."

Investigator Pafford eventually located co-defendant Wallace in Decatur County, Tennessee, and interviewed her. In Investigator Pafford's opinion, her written statement was internally inconsistent, and some information conflicted with the Defendant's statement.

Jeffrey Pearcy testified that he had pending charges for possession of stolen property related to Ms. Killen's jewelry. He stated that he acquired the jewelry on April 27, 2017, when he was in a friend's driveway and the Defendant pulled into the driveway as well. Mr. Pearcy was not previously acquainted with the Defendant, but assumed he was a mutual friend. Mr. Pearcy was a jeweler by trade and complimented the Defendant on several necklaces the Defendant was wearing; the Defendant indicated that they were for sale; and Mr. Pearcy bought them. Mr. Pearcy also examined a box of "some more stuff," including silver jewelry and a gold wedding band. He denied knowing the jewelry was stolen. The Defendant also asked Mr. Pearcy if he knew anyone "that may want a[n] ATV." Mr. Pearcy went home, set aside a necklace for his daughter, and in the morning, he went to a jewelry store to sell the remaining items. Before Mr. Pearcy finished the paperwork for the sale, the police arrived and he was arrested. Mr. Pearcy affirmed that he had not been promised anything in exchange for his testimony. When asked on cross-examination whether he had incentive to help the prosecutor in order to avoid a theft conviction, Mr. Pearcy stated that his lawyer was "to take care of that business" and that there was "nothing that [he could] do to help [him]self out of this right here."

---

[1] We gather that this referred to the ATV.

Co-defendant Wallace testified that she entered a guilty plea in this case and that her plea agreement was conditioned on her truthful testimony against the Defendant. She stated that on April 27, 2017, she and the Defendant were "riding around getting high" on methamphetamine in the Big Sandy area. The Defendant's white Malibu sedan was running out of gas, and they pulled up to the Killen house "just by chance" because co-defendant Wallace saw a gasoline canister sitting on a retaining wall by the house. A black truck was visible in the driveway.

Co-defendant Wallace stated that the Defendant opened the truck's back window in order to obtain the garage door opener inside and gain entrance to the house. She recalled that the truck's back window slid open and denied that the Defendant broke the window.

Co-defendant Wallace entered the house first from the unlocked garage door, and the Defendant followed. She recalled taking jewelry, a gun, and clothing from the master bedroom, and tools and the ATV from the garage. Co-defendant Wallace drove the ATV away from the house, and the Defendant followed in his car. They went to Mr. Rodriguez's house, parked the ATV in the woods, took turns shooting the gun at an old car on the property, and left. Co-defendant Wallace split the stolen property with the Defendant before going to her brother's house; she kept the gun and "some of the diamond rings." Co-defendant Wallace eventually traded her half of the property for drugs. She did not know anything about the Defendant's Kindle Fire tablet.

At the time of trial, co-defendant Wallace had also incurred a violation of probation related to a misdemeanor vandalism conviction. Co-defendant Wallace acknowledged that she pled guilty to theft under $1,000 in this case, a reduced charge, for which she was sentenced to thirty days at seventy-five percent service. The aggravated burglary charge was dismissed. Co-defendant Wallace disagreed, though, that she received a "sweet deal," noting that she served six months for the violation of probation, that she was "not a felon," and that she had not previously been in "too much trouble." She acknowledged, though, that it was a "pretty good deal."

Co-defendant Wallace read her written police statement into the record. In the statement, co-defendant Wallace averred that the Defendant called her and asked if she could sell an ATV. The Defendant picked her up; they went to Mr. Rodriguez's house; and co-defendant Wallace and the Defendant rode the ATV. The Defendant told her that he hoped to sell it for $2,000, and co-defendant Wallace responded that she would "see what [she] could do about it." The Defendant hid the ATV; they parted ways; and she had not seen him since. However, co-defendant Wallace then wrote, "The items include[d] jewelry, a camera, iPad, Pandora bracelet." The statement continued,

A couple of days I called Chris (indiscernible) -- for a ride. He showed up. Jewelry and unloaded gun. Me and Chris got into a fight because he was high out of his mind. I went to my mom's where I've been since then.

Then a few days ago Timbo had a Glock. A 9[mm] . . . a nice one, black and without a mark on it.

Co-defendant Wallace agreed that "[s]ome of" the police statement was a lie, but she maintained that her trial testimony was truthful. Co-defendant Wallace said that she and the Defendant were "[f]airweather friends" who had been friendly for a long time when it was convenient "[a]ssuming one of [them] got drugs or whatever." Co-defendant Wallace denied leaving the Defendant's Kindle Fire tablet at the Killens's house. She agreed that it was not reasonable to carry a Kindle into a house during a burglary.

On redirect examination, co-defendant Wallace affirmed that she served her violation of probation sentence in drug rehabilitation, that she owed $24,000 in restitution to the victim jointly and severally with the Defendant, and that her plea agreement was conditioned on her truthful testimony at trial. She agreed that a person high on methamphetamine did not always behave reasonably.

Darian Flatt, the Defendant's fiancée, testified on his behalf that co-defendant Wallace tried to sell jewelry to the Defendant and Ms. Flatt's mother. Ms. Flatt did not know the source of the jewelry. Ms. Flatt acknowledged her written police statement, which indicated that she saw co-defendant Wallace and the Defendant together on April 27 and that the pair "had been together through the evening hours." She denied that the Defendant and co-defendant Wallace were together through the night into the next day, however. Ms. Flatt explained that when the Defendant eventually came to pick Ms. Flatt up, co-defendant Wallace was at her brother's house and called the Defendant, asking him to join her there. Ms. Flatt and the Defendant "went across the street" and spoke to co-defendant Wallace. Ms. Flatt "made her get out of the vehicle because [Ms. Flatt] was just infuriated by that point."

Ms. Flatt read her written statement into the record, which was as follows:

Wednesday, around 9:00 p.m. Michael and I [were] at my house when Kelly started calling his phone talking about she needed a ride . . . . [W]herever she had been staying[,] she needed to get out of there and wanted Michael to give her a ride.

–5–

He leaves and I stay home. I fall asleep. Around 3:00 a.m. I woke up Thursday -- around 1:00 p.m. Michael and Kelly were there. Michael said that he had been there three times. I was a sleep [sic]. Kelly was inside talking to my mom. I was outside asleep in the camper.

Kelly had jewelry trying to trade two phones to my mom. My mom comes outside to the camper and said for me to get Kelly out of the house.

Jason Rodriguez testified that his nickname was J-Rod, that the Defendant was a long-time friend of his, and that he was familiar with co-defendant Wallace, whom he had met twice. On the first occasion, Mr. Rodriguez was in his yard working and saw an unknown woman, whom he later knew as co-defendant Wallace, drive an ATV up his driveway. He did not recognize the ATV. Co-defendant Wallace began conversing with Mr. Rodriguez as if she knew him, and he thought she might have been a neighbor and did not "want to be disrespectful," so he talked to her. Co-defendant Wallace asked him to "work on" the ATV, which she represented was hers. Mr. Rodriguez agreed to work on the ATV when he had time and asked her to park it beside one of his other vehicles. Co-defendant Wallace abruptly left when Mr. Rodriguez had his back turned.

Mr. Rodriguez testified that he "got paranoid" and asked a couple friends whether they knew co-defendant Wallace; no one knew anything about her. The next day, the ATV was gone. Later that week, the police came to Mr. Rodriguez's house and searched the woods around it. He told them about his interaction with co-defendant Wallace and showed them where the ATV had been parked. According to Mr. Rodriguez, when the police asked if the Defendant had accompanied co-defendant Wallace, Mr. Rodriguez responded that he had not but that the Defendant was a good friend of his and was welcome on his property anytime.

Mr. Rodriguez testified that he was a former Army Ranger and suffered from Post-Traumatic Stress Disorder. He stated that he would have known if anyone fired a gun on his property, and he denied that co-defendant Wallace fired a gun in his driveway. Mr. Rodriguez stated that he was a "God fearing man" and would not put his hand on the Bible and lie for anyone.

Upon this evidence, the Defendant was convicted as charged in Counts 1 and 2. The jury acquitted the Defendant of possession of a firearm by a convicted felon and possession of a firearm during the commission of a dangerous felony. The Defendant received an effective ten-year sentence as a Range II, multiple offender. He timely appealed.

ANALYSIS

*I. Sufficiency of the Evidence*

The Defendant contends that the evidence was insufficient to sustain his convictions because his identity as the person who entered the Killens's house and took their property was not adequately established, arguing that co-defendant Wallace was an incredible witness whose testimony was inadequately corroborated. The State responds that the evidence is sufficient.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; see also State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The following standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Our supreme court has held that circumstantial evidence is as probative as direct evidence. State v. Dorantes, 331 S.W.3d 370, 379-81 (Tenn. 2011). In doing so, the supreme court rejected the previous standard which "required the State to prove facts and circumstances so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." Id. at 380 (quoting State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971)) (quotation marks omitted).

Instead, "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Dorantes, 331 S.W.3d at 381. The reason for this is because with both direct and circumstantial evidence, "a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference[.]" Id. at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)). To that end, the duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

It is well-established in Tennessee that "a conviction may not be based solely upon the uncorroborated testimony of an accomplice." State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001) (citing State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994); Monts v. State, 379 S.W.2d 34, 43 (Tenn. 1964)). In this case, co-defendant Wallace was an accomplice who was indicted for the same offenses as the Defendant. See State v. Green, 915 S.W.2d 827, 831 (Tenn. Crim. App. 1995); Pennington v. State, 478 S.W.2d 892, 897-98 (Tenn. Crim. App. 1971) (citations omitted).

Our supreme court has described what is required to establish sufficient corroboration as follows:

[T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

Shaw, 37 S.W.3d at 903 (quoting Bigbee, 885 S.W.2d at 803). The corroborating evidence need only be "slight." State v. Griffs, 964 S.W.2d 577, 589 (Tenn. Crim. App. 1997). While "[e]vidence which merely casts a suspicion on the accused . . . is inadequate to corroborate an accomplice's testimony," the "evidence is sufficient if it connects the accused with the crime in question." Id. Whether there is sufficient corroborating evidence is a question for the jury. Shaw, 37 S.W.3d at 903.

Theft of property occurs when a person "knowingly obtains or exercises control over the property without the owner's effective consent" with the intent "to deprive the owner of [the] property." Tenn. Code Ann. § 39-14-103(a). A person acts knowingly

"with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." Tenn. Code Ann. § 39-11-106(a)(20). A person acts knowingly "with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Id. Theft of property valued at $10,000 or more but less than $60,000 is a Class C felony. Tenn. Code Ann. § 39-14-105(a)(4). Aggravated burglary occurs, in relevant part, when a person enters a habitation "with intent to commit a . . . theft[.]" Tenn. Code Ann. §§ 39-14-402(a)(1), -14-403(a).

As a preliminary matter, we note that the Defendant's argument regarding co-defendant Wallace's credibility and the inconsistencies in her testimony do not entitle him to relief. The jury chose to accredit her version of events regarding the burglary. As we have stated time and time again, the determination of issues of witness credibility and the resolution of conflicts in testimony rest squarely within the province of the jury. Bland, 958 S.W.2d at 659. This court will not substitute our judgment for the finder of fact or to disturb its findings on appeal.

In the light most favorable to the State, co-defendant Wallace's identification of the Defendant was adequately corroborated and his identity sufficiently established. Ms. Flatt's police statement placed the Defendant and co-defendant Wallace together throughout the day on April 27. Co-defendant Wallace testified that on April 27, she and the Defendant were high on methamphetamine and gained entry to the Killens's house by using the garage door opener inside the truck. After the burglary, they split the proceeds, and Mr. Pearcy testified that on the evening of April 27, he bought several pieces of jewelry from the Defendant. The Defendant also asked Mr. Pearcy if he knew anyone looking to purchase an ATV. The police recovered several stolen items from the Defendant's car. The Defendant's Kindle Fire tablet was found in the Killens's garage.

The evidence was sufficient for a reasonable jury to have found that the Defendant entered the Killens's house without their consent and took their property. "It is well-established that the identification of a defendant as the person who committed the offense for which he is on trial is a question of fact for the determination of the jury upon consideration of all competent proof." State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993) (citing State v. Crawford, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982)). The Defendant is not entitled to relief on this basis.

CONCLUSION

–9–

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE